UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MURRAY W. PUTNAM, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-cv-00154-JAW |
| | ) | |
| REGIONAL SCHOOL UNIT 50, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Murray Putnam is suing a school district and two of its superintendents, alleging that they decided not to renew his contracts in retaliation to his opposition to school consolidation, that the school board held secret meetings regarding his employment, that the school board violated its own policies on open meetings and public comment, and he was wrongfully terminated because of his age. The Court denies the motion for summary judgment as to Mr. Putnam's 42 U.S.C. § 1983 count based on retaliation for exercising his right of protected speech, but the Court grants the motion as to the remaining counts, specifically his 42 U.S.C. § 1983 count based on alleged violations of his associational rights, his right to petition for redress, and his free speech rights, his due process count, and his age discrimination count.

## I. PROCEDURAL POSTURE

On April 11, 2014, Mr. Putnam filed a complaint against the Defendants Regional School Unit 50, John Doe, individually and in his capacity as

Superintendent of Regional School Unit 50, and Larry Malone, individually and in his capacity as Superintendent of Regional School Unit 50. *Compl.* at 1-2 (ECF No. 1) (*Compl.*). The Complaint contains four counts: (1) Count One, filed under 42 U.S.C. § 1983, alleges that all three Defendants retaliated against him for protected speech; (2) Count Two, also filed under 42 U.S.C. § 1983, alleges that all three Defendants violated his associational rights, his right to petition for redress, and his free speech rights; (3) Count Three, the statutory basis of which is not specified, alleges that all three Defendants violated his due process rights; and, (4) Count Four, filed under the Maine Human Rights Act, 5 M.R.S. §§ 4551 *et seq.*, alleges that all three Defendants discriminated against him because of his age. *Compl.* at 1-11. The Defendants answered the Complaint on May 21, 2014. *Answer* (ECF No. 4).

On December 19, 2014, the Defendants filed a notice of intent to file a motion for summary judgment and requested a pre-filing conference. *Notice of Intent to File Mot. for Summ. J.* (ECF No. 10). In anticipation of a Local Rule 56(h) Conference, the Defendants filed a pre-conference memorandum on December 30, 2014. *Defs.' Local Rule 56(h) Mem.* (ECF No. 13). On February 4, 2015, the Court held a Local Rule 56(h) conference with counsel. *Local Rule 56(h) Pre-Filing Conference* (ECF No. 15).

On February 11, 2015, the Defendants moved for summary judgment with a supporting statement of material facts. *Defs.' Mot. for Summ. J.* (ECF No. 16) (*Defs.' Mot.*); *Defs.' Statement of Material Facts Not in Dispute in Supp. of Mot. for Summ. J.* (ECF No. 17) (DSMF). On March 13, 2015, Mr. Putnam opposed the Defendants'

motion.  *Pl.'s Resp. to Defs.' Mot. for Summ. J.* (ECF No. 19) (*Pl.'s Opp'n*).  He filed a reply to the Defendants' statement of material facts that same day, *Resp. to Defs.' Statement of Material Facts and Pl.'s Statement of Additional Material Facts*, at 1-5 (ECF No. 20) (PRDSMF), and filed his own statement of additional material facts, *id*. at 5-15 (PSAMF).  On March 17, 2015, the Defendants filed a reply to Mr. Putnam's opposition and to his statement of material facts.  *Defs.' Reply in Support of Mot. for Summ. J.* (ECF No. 21) (*Defs.' Reply*); *Defs.' Reply to Pl.'s Statement of Additional Material Facts* (ECF No. 22) (DRPSAMF).

## II.  SUMMARY JUDGMENT FACTS

### A.  Creation of Regional School Unit 50

In 1973, several school districts consolidated to create the Southern Aroostook Community School District (Southern Aroostook).  PSAMF ¶ 61; DRPSAMF ¶ 61.  In 2008, the Maine Legislature enacted a law requiring local schools to consolidate into regional school units.  PSAMF ¶ 73; DRPSAMF ¶ 73.   By January of 2011, there was a proposal to consolidate Southern Aroostook with the Katahdin School District (Katahdin).  PSAMF ¶ 74; DRPSAMF ¶ 74.

School consolidation has been a controversial issue across the state of Maine and the consolidation of Katahdin and Southern Aroostook was and remains a matter of serious controversy in the district.[1]   DSMF ¶ 2; PRDSMF ¶ 2; PSAMF ¶ 75;

---

[1]    The Defendants' paragraph two states:

As with communities all over the state, consolidation was a controversial issue in the communities that would ultimately form RSU 50.  DSMF ¶ 2.

Mr. Putnam interposed a qualified response to Defendants' paragraph two on the ground that Mr. Putnam and Mr. Comeau "were respected members of the community who when they spoke citizens

DRPSAMF ¶ 75.  In the communities that would ultimately comprise Regional School Unit 50 (RSU 50), some citizens were in favor of consolidating their community schools with neighboring schools, while others were opposed to it.  DSMF ¶ 3; PRDSMF ¶ 3.

Two of the most influential voices speaking out against consolidation were Terry Comeau, then the superintendent of Southern Aroostook, and Murray Putnam. PSAMF ¶ 76; DRPSAMF ¶ 76.  Mr. Putnam began speaking out against consolidation in 2007, and was a vocal opponent of consolidation through 2011.  DSMF ¶¶ 4, 5; PRDSMF ¶¶ 4, 5.  Mr. Comeau and Mr. Putnam made it clear they were speaking as private citizens in voicing their opposition to consolidation.  PSAMF ¶ 77; DRPSAMF ¶ 77.  Jonathan Porter, the current principal of Southern Aroostook, was also opposed to consolidation.  DSMF ¶¶ 7, 8; PRDSMF ¶¶ 7, 8.  Mr. Putnam heard that other RSU 50 employees had expressed reservations about school consolidation, and to the best of his knowledge, these individuals are still employed by RSU 50 with the exception of Mr. Comeau.[2]  DSMF ¶ 6; PRDSMF ¶ 6.

---

gave their opinions weight."  PRDSMF ¶ 2.  Mr. Putnam's qualified response is a non sequitur; his qualification neither addresses paragraph two nor the evidence upon which paragraph two is based. Furthermore, the record evidence Mr. Putnam cites in support of his qualification does not mention Mr. Comeau.  *See* PRDSMF Attach. 8 *Decl. of Sean LeFay*, ¶ 5 (ECF No. 20-8) (*LeFay Decl.*).  Finally, the Local Rules require that if the non-movant desires to place additional facts into the summary judgment record, he shall do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).  The Court admits the Defendants' statement of material fact paragraph two without qualification.

[2]      Mr. Putnam interposed a qualified response to Defendants' paragraph six on the ground that Mr. Comeau opposed consolidation and is no longer employed by RSU 50.  PRDSMF ¶ 6.  The record supports Mr. Putnam's qualification.  *See* PRDSMF Attach. 7 *Decl. of Terry A. Comeau*, ¶¶ 1, 6 (ECF No. 20-7) (*Comeau Decl.*).  The Court amended the Defendants' statement to reflect the qualification.

In the spring of 2011, the towns comprising the Katahdin and Southern Aroostook districts voted on whether to consolidate.  PSAMF ¶ 78; DRPSAMF ¶ 78.  The vote was sharply divided but in the end the decision was made to consolidate the districts.  PSAMF ¶ 79; DRPSAMF ¶ 79.  In July 2011, RSU 50 was formed, comprised of Southern Aroostook and Katahdin.  DSMF ¶ 1; PRDSMF ¶ 1.

### B.    Murray Putnam

RSU 50 and several of its predecessors hired Murray Putnam in 1968 and continued to employ him.  DSMF ¶ 14; PRDSMF ¶ 14.  Mr. Putnam held a number of teaching and administrative positions over the years, but he was always the boys' varsity baseball coach.  DSMF ¶ 15; PRDSMF ¶ 15.  During the 2011-2012 school year, Mr. Putnam had contracts to serve as the boys' varsity baseball coach and the Southern Aroostook athletic administrator.  DSMF ¶ 16; PRDSMF ¶ 16.  These contracts expired on June 30, 2012.  *Id.*

Mr. Putnam graduated from Ricker College in 1968 with a degree in history.  PSAMF ¶ 58; DRPSAMF ¶ 58.  Upon his graduation, he "locked his gazes upon the communities he served and stayed stead foot for forty-four years."  PSAMF ¶ 59; DRPSAMF ¶ 59.  From 1968 to 1973, Mr. Putnam taught a variety of subjects and served as the varsity baseball coach for what was Oakfield High School.  PSAMF ¶ 60; DRPSAMF ¶ 60.  Mr. Putnam taught social studies and served as the varsity baseball coach and athletic director for Southern Aroostook until the school district refused to extend his contract in June 2012.  PSAMF ¶ 62; DRPSAMF ¶ 62.  Six different times in the course of Mr. Putnam's employment at Southern Aroostook, he

was called upon to serve, and did serve, as the interim principal of the school. PSAMF ¶ 63; DRPSAMF ¶ 63.

During the forty-four years Mr. Putnam served the school, he was the type of coach that changed young men's lives. PSAMF ¶ 64; DRPSAMF ¶ 64. He believed that athletics was not only about winning but was also about teaching young men the value of handwork, discipline, compassion, and teamwork. *Id.* Players credited him decades later for shaping their lives. PSAMF ¶ 65; DRPSAMF ¶ 65. It was not widely known, but when players could not afford a team jacket or to go on a trip, Mr. Putnam would pay for it out of his own pocket. PSAMF ¶ 66; DRPSAMF ¶ 66. When Mr. Putnam saw a kid having problems fitting in at school, he would find a place for them on the baseball team. PSAMF ¶ 67; DRPSAMF ¶ 67. At Southern Aroostook, being on the baseball team meant something. PSAMF ¶ 68; DRPSAMF ¶ 68.

The life lessons Mr. Putnam taught the team paid off, and on five different occasions the team brought home a state championship in baseball. *Id.* In rural Maine, a state championship means a great deal to the community. PSAMF ¶ 69; DRPSAMF ¶ 69. It created a pride of place and a pride in belonging. *Id.*

Mr. Putnam's commitment to the community is recognized by the public. PSAMF ¶ 70; DRPSAMF ¶ 70. He is considered a man of integrity. *Id.* He is just and fair. PSAMF ¶ 71; DRPSAMF ¶ 71. He was considered an influential voice in matters affecting the school because of his reputation for fairness, his integrity, his tenure at the school system, and his commitment to the students of Southern Aroostook. PSAMF ¶ 72; DRPSAMF ¶ 72.

### C.     Anonymous Letter Demands Mr. Putnam's Retirement

In April 2011, a month after the consolidation, Scot Walker, a former member of the RSU school board (Board) and a member of the incoming Board, received an anonymous letter demanding "Murray, For the Love of God, would you please retire?", and accusing Mr. Putnam of being "old . . . and obstinence [sic]."[3]   DSMF ¶ 54; PRDSMF ¶ 54; PSAMF ¶ 80; DRPSAMF ¶ 80.   The letter concluded by saying "Murray, I'm telling you to do yourself a favor, retire after this year."   *Id.*

Mr. Walker turned the letter over to John Doe.[4]   DSMF ¶ 55; PRDSMF ¶ 55. Mr. Walker also delivered a copy of the letter to then-superintendent Mr. Comeau. PSAMF ¶ 82; DRPSAMF ¶ 82.   Mr. Comeau forwarded the letter to Bruce Smith, Esquire, of Drummond Woodsum, who agreed with Mr. Comeau that no action should be taken because the letter was anonymous.   *Id.*

Mr. Comeau gave a copy of the letter to Mr. Putnam so that he would know what was going on and because Mr. Comeau was leaving in June.[5]   *Comeau Decl.* ¶

---

[3]     The Defendants' paragraph fifty-four says that as of April 2011, Mr. Walker was "a former member of the RSU school board. . . ."   DSMF ¶ 54.   Mr. Putnam admitted Defendants' paragraph fifty-four without qualification. PRDSMF ¶ 54.   Mr. Putnam's paragraph eighty says that as of April 2011, Mr. Walker was a "member of the incoming RSU #50 School Board." PSAMF ¶ 80.   The Defendants admitted Mr. Putnam's paragraph eighty without qualification.   DRPSAMF ¶ 80.   None of the cited material by either the Plaintiff or the Defendants clarifies Mr. Walker's board status as of April 2011.   Based on the admissions, the Court has included both statements because they do not contradict each other.

[4]     The Defendants' paragraph fifty-five states that "Scot Walker gave the letter to Superintendent Doe."   DSMF ¶ 55.   Mr. Putnam admitted the statement. PRDSMF ¶ 55.   Elsewhere, Mr. Putnam stated that Mr. Walker "delivered the letter to then school Superintendent, Terry Comeau."   PSAMF ¶ 82.   The Defendants admitted this statement.   DRPSAMF ¶ 82.   From other information in the record, as of April 2011, Mr. Comeau, not Mr. Doe, was the superintendent as of April 2011.   The Court amended paragraph fifty-five to conform to other agreed-upon evidence in the record.

[5]     The parties did not include this statement in their statements of material fact, but it is contained in Mr. Comeau's Declaration.   The Court has included this fact because it reveals how Mr. Putnam found out about the letter.

11.  Mr. Putnam perceived the letter as an implied threat that if he did not retire, he would be forced out.[6]  PSAMF ¶ 81; DRPSAMF ¶ 81.

### D.    RSU 50 Board Formation, Leadership, and Policies

Katahdin's superintendent, a consolidation supporter, retired, and so it fell upon Mr. Comeau, then the Southern Aroostook superintendent, to seat the newly-consolidated Board.  PSAMF ¶ 83; DRPSAMF ¶ 83.  In July 2011, the Board held a meeting to appoint a superintendent of the newly-consolidated RSU 50.  PSAMF ¶ 84; DRPSAMF ¶ 84.  The Board offered Mr. Comeau the superintendent's position for five months, which would terminate in December 2011.  *Id.*  Mr. Comeau told the Board that given the nature of the superintendent's duties, a five-month term ending in December did not make sense.  PSAMF ¶ 85 DRPSAMF ¶ 85.  The Board insisted that Mr. Comeau accept the five-month term.  *Id.*  When Mr. Comeau said he could not do a five-month term, the Board hired John Doe for a one-year term as interim superintendent of RSU 50.  DSMF ¶ 9; PRDSMF ¶ 9; PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Doe stated he has no recollection of whether Mr. Putnam was in favor of or opposed to school consolidation.[7]  DSMF ¶ 10; PRDSMF ¶ 10.

---

[6]     The Defendants denied Mr. Putnam's paragraph eighty-one because it is not a fact that would be admissible in evidence and is instead Mr. Putnam's inaccurate characterization of the letter telling him to retire.  DRPSAMF ¶ 81.  Mr. Putnam's statement of fact is an accurate reflection of his own declaration, which is part of the record.  *See Putnam Decl.* ¶ 11.  However, the Court agrees that the statement represents Mr. Putnam's perception of the letter's message, and rephrased the statement accordingly.

[7]     Mr. Putnam interposed a qualified response to Defendants' paragraph ten because Mr. Putnam was a vocal opponent of school consolidation at school board meetings.  PRDSMF ¶ 10.  This qualification, however, does not address whether Mr. Doe now knows that Mr. Putnam was opposed to school consolidation.  The Court considers Mr. Putnam's qualification non-responsive.  Furthermore, the record supports the Defendants' statement, and the Local Rules require that if the non-movant desires to place additional facts into the summary judgment record, he shall do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).  The Court admits the Defendants' statement of material fact without qualification.

8

In RSU 50, the Board, not the Superintendent, was responsible for appointing one-year, co-curricular positions.[8]  DSMF ¶ 43; PRDSMF ¶ 43.  Mr. Doe did not take

---

[8]      In their paragraph forty-three, the Defendants asserted that "the superintendent is responsible for appointing one-year, co-curricular positions."  DSMF ¶ 43.  Mr. Putnam denied Defendants' paragraph forty-three, and cited specific paragraphs in the declarations of Board members Leanne White and Nichole Cullinan.  PRDSMF ¶ 43.  In the cited portion of her declaration, Ms. White stated:

> 8. During the summer of 2012, I read the proposed rule changes which said that the hiring for secondary and co-curricular positions were to be shifted from the School Board to the Superintendent.  I spoke with both the chairman, Phil Knowles, and the Superintendent Larry Malone and said that I understood the policy had been proposed, but it had not been adopted.  I told them I thought they were acting outside the scope of their authority.  Neither of them contradicted me nor offered any documentation that the policy change had been adopted by the RSU #50 School Board.

PRDSMF Attach. 12 *Decl. of Leanne White*, ¶ 8 (ECF No. 20-12) (*White Decl.*).  In the cited portion of her declaration, Ms. Cullinan stated:

> In the fall of 2011 there was a second reading of the Co-Curricular Policy for RSU #50.  Under the new policy, the Superintendent would have the power to appoint coaches and the Athletic Director rather than the Board.  While the policy was read, it was never voted upon.  To my knowledge in the summer of 2012 the RSU #50 Board still held the exclusive power to appoint coaches and athletic directors for the RSU #50 system.

PRDSMF Attach. 10 *Decl. of Nichole Cullinan,* ¶ 4 (ECF No. 20-10) (*Cullinan Decl.*).

In support of their paragraph forty-three, the Defendants cited the depositions of Mr. Doe, Mr. Malone, and Mr. Walker.  DSMF ¶ 4.  In the cited portion of his deposition, Mr. Doe stated:

> I had not appointed any positions for any of the co-curricular positions which are one-year appointments, and I had not done any of those prior to my leaving, and [Mr. Malone would] have to do all those after July 1st of 2012.

DSMF Attach. 6 *Dep. of John Doe,* at 78:14-18 (ECF No. 17-6) (*Doe Dep.*).  In Mr. Malone's deposition, he testified:

> A. I recall [Mr. Putnam] saying that, as the superintendent, I had the authority to appoint annual positions.
> Q. And did you believe you had that authority?
> A. Yeah, I did know that.  I had asked about how we handle hiring coaches.
> Q. So you didn't have to go through the school board?
> A. No.  The superintendent has the authority here to do that.
> . . .
> Q. I thought you said that you made the decision, not the school board?
> A. Mm-hmm.
> Q. So you were going to bring - - did you bring all of the names of the co-curricular appointments that year to the school board?

any action on any co-curricular positions that were one-year appointments for the 2012-2013 year as interim superintendent.  DSMF ¶ 44; PRDSMF ¶ 44.

Board members receive training from Maine School Management concerning appropriate board policies and procedures including that agenda items should not be discussed outside the convened board meeting.  DSMF ¶ 57; PRDSMF ¶ 57.

In the fall of 2011, Jeff Hardy was serving as the vice chair of the Board, and Leanne White and Nichole Cullinan were members of the Board.  PSAMF ¶ 87; DRPSAMF ¶ 87.  Ms. White and Ms. Cullinan recall a reading of new RSU 50 policies that would have shifted the responsibility for the appointment of coaches and co-curricular positions from the school board to the superintendent.  PSAMF ¶ 88; DRPSAMF ¶ 88.  However, both Ms. White and Ms. Cullinan confirm that the new policy was neither voted on nor enacted by the Board.  PSAMF ¶ 89; DRPSAMF ¶ 89.

---

A. I did.

*Malone Dep.* at 20:19-21:25; 21:1-2; 21:18-24.  Finally, in his deposition, Mr. Scot Walker testified:

> Q. Did you ever vote against Mr. Putnam's appointment as a baseball coach of Southern Aroostook Community Schools as a school board member?
> A. We didn't - - as a school board member, we didn't vote on secondary positions.  There was [sic] appointments made, but they were hired through the superintendent.  We were made aware of the nominations, but we didn't vote on them, as I recall.

*Scot Walker Dep.* at 21:13-21.
The evidence cited by each side supports different conclusions.  Mr. Putnam's reliance on the statements of two board members supports his denial of the statement that the superintendent was responsible for appointing one-year, co-curricular positions, and supports a statement that the school board was responsible for appointing co-curricular positions.  However, the Defendants' reliance on the testimony of the principal, superintendent, and a board member for the statement that the appointment authority rested with the superintendent is likewise justified.  Neither party has submitted evidence of the actual policies or proposed policies themselves.
Viewing the evidence in the light most favorable to Mr. Putnam, the Court concludes that there is a dispute of fact as to whether the school board or the superintendent had the authority in 2011-2012 to appoint co-curricular positions such as coaches and athletic directors and concludes that the Board, not the Superintendent, had the authority to make such appointments.

### E.     Annual Spring Baseball Trip

Every year for several decades, Mr. Putnam had taken the baseball team on a trip out of state during April school vacation.  DSMF ¶ 17; PRDSMF ¶ 17.  Over the years, players on Mr. Putnam's team were hazed.[9]  DSMF ¶ 18; PRDSMF ¶ 18.

---

[9]     Mr. Putnam interposed a qualified response to Defendants' paragraph eighteen because neither Mr. Porter nor Mr. Walker ever told Mr. Putnam about hazing even when seated on the Board or as administrator, and because other witnesses state there was no hazing.  PRDSMF ¶ 18.  To support his qualification, Mr. Putnam relies on Mr. Porter's deposition testimony that reads as follows:

> Q. Prior to the spring, varsity baseball 2012 trip, did you have any more conversations
>    with Mr. Putnam saying, "We have concerns about hazing, you want to be really
>    careful," anything like that?
> A. I don't recall them.

PRDSMF Attach. 4 *Dep. of Jonathan Porter*, at 41:25-42:4 (ECF No. 20-4) (*Pl.'s Porter Dep.*).
     The Defendants rely on the deposition testimony of Mr. Porter and Mr. Walker, and a report prepared by Drummond Woodsum.  The cited portion of Mr. Porter's deposition testimony reads as follows:

> Q. Was any hazing going on when you were on the team?
> A. Yes
> Q. You graduated from Southern Aroostook - - I'm sorry, again, '90?
> A. '91.

DSMF Attach. 1 *Dep. of Jonathan Porter*, at 5:20-24 (ECF No. 17-1) (*Porter Dep.*).  The cited portion of Scot Walker's deposition reads as follows:

> Q. When you were on the baseball team, did you experience any hazing?
> A. Yes.

DSMF Attach. 3 *Dep. of Scot Walker*, at 6:17-19 (ECF No. 17-3) (*Scot Walker Dep.*).
     The report from Drummond Woodsum stated, "I find that not only did hazing occur multiple times on this year's trip, but it has been prevalent on past trips and that fact is widely known among players and adults alike."  DSMF Attach. 9 *May 29, 2012 Mem. from M. Thomas Trenholm, Esq. to John Doe*, at 7 (ECF No. 17-9) (*Trenholm Mem.*).
     The record supports the Defendants' statement of fact.  Additionally, even viewing the evidence in the light most favorable to Mr. Putnam, the Court concludes that neither Mr. Putnam's qualification nor the evidence he cites to support it contradict the statement that there was hazing on the team.  Mr. Porter's deposition does not say anything about Mr. Walker telling Mr. Putnam about hazing, or whether other witnesses stated there was no hazing on the team.  If Mr. Putnam wishes to put evidence into the record that he did not know about the hazing, the Local Rules require that he do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).  Finally, the fact that Mr. Porter did not report the hazing to Mr. Putnam until much later is covered by Defendants' paragraph twenty-one.  The Court admits the Defendants' statement without qualification.

11

People who were either hazed themselves or witnessed others being hazed include: (1) the current high school principal, Jonathan Porter; (2) Stephen Walker, a current Board member; and (3) Scot Walker, a former member of the Board.[10]  DSMF ¶ 19; PRDSMF ¶ 19.

In December 2011, Mr. Putnam asked Mr. Porter whether hazing happened on the April trip that Mr. Porter attended, and Mr. Porter told Mr. Putnam that he had been hazed and that a few ball players had their pubic hair shaved by a straight razor as part of a freshman initiation; however, Mr. Porter never reported the hazing to Mr. Putnam while he was on the team.[11]  DSMF ¶ 21; PRDSMF ¶ 21.  Mr. Porter told Mr. Putnam that he should not do the April trip.[12]  DSMF ¶ 20; PRDSMF ¶ 20.  Mr. Putnam told Mr. Porter that he had done the trip for many years and the Board was not going to tell him he could not.[13]  DSMF ¶ 22; PRDSMF ¶ 22.  Mr. Putnam told

---

[10]    Mr. Putnam interposed a qualified response to Defendants' paragraph nineteen because neither Mr. Porter nor Mr. Walker ever told Mr. Putnam about hazing even when seated on the school board or as administrator, and other witnesses state there was no hazing.  PRDSMF ¶ 19.  He cites the same portion of Mr. Porter's deposition that he cited in response to Defendants' paragraph eighteen.  Again, even viewing the evidence in the light most favorable to Mr. Putnam, it does not support his qualification and is not responsive to the Defendants' statement of material fact.  The record supports the Defendants' statement, and the Court admits the statement without qualification for the same reasons as in footnote nine.

[11]    Mr. Putnam interposed a qualified response to Defendants' paragraph twenty-one because Mr. Porter never reported hazing to Mr. Putnam while he was on the team.  PRDSMF ¶ 21.  The record supports Mr. Putnam's qualification, and the Court modified the statement of fact to reflect that Mr. Porter never reported the hazing to Mr. Putnam when he was on the team.

[12]    Mr. Putnam interposed a qualified response to Defendants' paragraph twenty because Mr. Doe put the spring trip on the Board's agenda and the trip was approved by all but one negative vote.  PRDSMF ¶ 20.  The record supports the Defendants' statement, and the Court admits the statement without qualification because Mr. Putnam's qualification is non-responsive.  If Mr. Putnam wishes to put evidence into the record that the trip was approved, the Local Rules require he to do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).

[13]    Mr. Putnam interposed a qualified response to Defendants' paragraph twenty-two because Mr. Doe put the spring trip on the Board agenda and the trip was approved by all but one negative vote.  PRDSMF ¶ 22.  The Defendants' record citation supports their statement, and Mr. Putnam's qualification does not controvert it.  If Mr. Putnam wishes to put additional evidence into the record,

Mr. Porter that once he was done, the trip would happen no longer.  DSMF ¶ 23; PRDSMF ¶ 23.

That same month, the Board met to discuss the annual spring varsity baseball trip.  PSAMF ¶ 91; DRPSAMF ¶ 91.  The trip was initially disapproved by the Board due to cost concerns.  *Id.*; DSMF ¶ 24; PRDSMF ¶ 24.  No one on the Board voiced any concerns to Mr. Putnam about any alleged hazing.  PSAMF ¶ 92; DRPSAMF ¶ 92.

In January 2012, the Board met again and discussed the baseball trip.  DSMF ¶ 25; PRDSMF ¶ 25; PSAMF ¶ 93; DRPSAMF ¶ 93.  Mr. Putnam clarified that only a minimal expense (for the school bus driver and the gas) was borne by the school.  PSAMF ¶ 94; DRPSAMF ¶ 94.  The Board then approved the annual spring varsity baseball trip.  *Id*.  Again, no one on the Board voiced concerns to Mr. Putnam warning him to be wary of any potential hazing.  PSAMF ¶ 95 DRPSAMF ¶ 95.

In April 2012, the boys' varsity baseball team went on their annual spring trip to Massachusetts.  PSAMF ¶ 112; DRPSAMF ¶ 112.  Parents with students on the team were in constant contact with their children.  PSAMF ¶ 113; DRPSAMF ¶ 113.  They did not get the sense that there was any hazing or anything else going on which would "raise their 'hackles.'"  PSAMF ¶ 114; DRPSAMF ¶ 114.  The parents were confident that Mr. Putnam would take care of their kids and any disciplinary issues; he always had.  PSAMF ¶ 115; DRPSAMF ¶ 115.

---

the Local Rules require that he do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).  The Court admits the statement without qualification.

F.    Jonathan Porter

In 2005, Mr. Porter became the principal of Southern Aroostook, and was Mr. Putnam's supervisor from 2005 to 2012.  PSAMF ¶¶ 96, 101, 107; DRPSAMF ¶¶ 96, 101, 107.  He had been a student at Southern Aroostook and had played baseball for Mr. Putnam before graduating in 1991.  PSAMF ¶ 97 DRPSAMF ¶ 97.  He never reported any hazing to Mr. Putnam.  PSAMF ¶ 98; DRPSAMF ¶ 98.  Mr. Porter graduated from the University of Maine at Presque Isle with a degree in physical education in 1995.  PSAMF ¶ 99; DRPSAMF ¶ 99.  After he graduated, Mr. Porter took a post at Southern Aroostook as a physical education and health teacher. PSAMF ¶ 100; DRPSAMF ¶ 100.

At least one Board member thought that Mr. Porter was intimidated by Mr. Putnam.  PSAMF ¶ 102; DRPSAMF ¶ 102.  The Board member believed that Mr. Putnam had a lot of "community support" and a "solid reputation" in the community and had been "popped up on a little bit of a pedestal."  PSAMF ¶ 103; DRPSAMF ¶ 103.

In 2009, Mr. Porter advised the Board that when Mr. Putnam retired, he could do the work Mr. Putnam was doing as vice principal.[14]  PSAMF ¶ 104; DRPSAMF ¶

---

[14]    The Defendants interposed a qualified response to Mr. Putnam's paragraph 104 because the record citation only indicates that Mr. Porter said he could do the work Mr. Putnam had done as vice principal.  DRPSAMF ¶ 104.  Both the Defendants and Mr. Putnam cite the following portion of Candis Nevers' declaration:

> 4. During the discussion, John Porter, Principal of the Southern Aroostook Community School said he didn't know when Mr. Putnam planned to retire but he could do the work that Mr. Putnam was doing as Vice Principal.

PRDSMF Attach. 16 *Decl. of Candis Nevers*, ¶ 4 (ECF No. 20-16) (*Nevers Decl.*).

14

104.  In 2012, when Mr. Putnam was separated from the school, Mr. Porter, who was thirty-nine years old, took Mr. Putnam's position as athletic director at Southern Aroostook.[15]   PSAMF ¶ 105; DRPSAMF ¶ 105.  Mr. Porter received an additional stipend for taking Mr. Putnam's position.  PSAMF ¶ 106; DRPSAMF ¶ 106.

Ultimately, it was Mr. Porter's duty to stop any "hazing" that occurred. PSAMF ¶ 108; DRPSAMF ¶ 108.  Mr. Porter claims that sometime in 2011, he had a conversation with Mr. Putnam about "hazing" incidents that occurred when he was on the team from 1987 to 1991.  PSAMF ¶ 109; DRPSAMF ¶ 109.  Mr. Porter is "not sure" why he waited until 2011 to tell Mr. Putnam that he had concerns about hazing, even though he became Mr. Putnam's boss in 2005.  PSAMF ¶ 110; DRPSAMF ¶ 110. At no time prior to the 2012 varsity spring baseball trip can Mr. Porter recall ever telling Mr. Putnam "[w]e have concerns about hazing, you really want to be careful." PSAMF ¶ 111; DRPSAMF ¶ 111.

### G.    Hazing Complaint Letter

On May 7, 2012, John Walker, Scot and Stephen Walker's father, and Paige and Kenneth Colville, Stephen Walker's mother and father-in-law, sent a letter to

---

Even viewing the evidence in the light most favorable to Mr. Putnam, the Court concludes that the record citation supports the Defendants' qualification.  The Court modified the statement to accurately reflect the record.

[15]     Mr. Putnam's paragraph 105 states:

In 2012, when Mr. Putnam was separated from the school, Mr. Porter, who was 39, took Mr. Putnam's position as Athletic Director for the Southern Aroostook Community Schools.

PSAMF ¶ 105. The Defendants admitted this statement without qualification, DRPSAMF ¶ 105, and so the Court included it as written.  By the Court's reckoning, however, the consolidation had taken place by 2012, so it would appear that the position would technically be with RSU 50.

Superintendent Doe complaining of alleged hazing of freshmen on the April 2012 varsity baseball trip.[16]  DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 116; DRPSAMF ¶ 116. Mr. Doe did not call Mr. Putnam and advise him that there was a complaint against him.[17]  PSAMF ¶ 125; DRPSAMF ¶ 125.

---

[16]     Mr. Putnam interposed a qualified response to Defendants' paragraph twenty-six because several members of the baseball team state that no hazing occurred.  PRDSMF ¶ 26.  In support of his qualification, he cites the following portion of Mr. LeFay's declaration:

> 10. My son, "Gage" LeFay was a Freshman on the baseball team during the Spring 2012 trip and as a rookie would have been subjected to hazing, had it occurred.

> 11. I was in contact with my son the entire trip and never once did I even get the sense that my son was in danger or that anything else was going on other than the kids were having a nice trip.

*LeFay Decl*. ¶¶10-11.  This evidence does not directly controvert Defendants' statement that freshman were hazed on the trip.  However, Mr. LeFay's declaration also stated that his son Gage LeFay told Mr. Trenholm and Mr. Porter that he "did not know of hazing and had not seen it" on the trip.  *Id*. ¶ 14.  This provides some support for Mr. Putnam's statement, however it is problematic for two reasons.  First, the statement comes from the declaration of a parent of a baseball player, not the player himself.  Second, Mr. Putnam has not presented evidence that "several members" state no hazing occurred.  However, the Court modified Defendants' paragraph twenty-six to reflect that the hazing discussed in the May 7, 2012 letter was "alleged," that is, not confirmed in this record by any of the players themselves.  *See* PSAMF ¶ 116; DRPSAMF ¶ 116.

[17]     Mr. Putnam's paragraph 125 states:

> Superintendent Doe had never expressed to Mr. Putnam concerns about hazing on the 2012 annual spring varsity baseball trip.

PSAMF ¶ 125.  The Defendants denied the paragraph and asked that it be stricken because they claimed that it was not supported by the record citation.  DRPSAMF ¶ 125.  They also note that Mr. Doe put Mr. Putnam on administrative leave because of the hazing allegations, citing their paragraph twenty-eight, which Mr. Putnam admitted.

> In support of his paragraph 125, Mr. Putnam cited a portion of Mr. Doe's deposition:

> Q. Was there some reason, after you received the complaint, that you did not call Mr. Putnam down and advise him that there was a complaint against him?
> A. I don't believe I informed him, no.

*Doe Dep*. at 52:6-9.  The Court agrees that the record does not support Mr. Putnam's paragraph 125 to the effect that Mr. Doe had never expressed concerns to him about the hazing allegations.  The Court modified the statement to more accurately reflect the record citation.

Neither John Walker nor Kenneth or Paige Colville had children on the 2012 varsity baseball team.  PSAMF ¶ 117; DRPSAMF ¶ 117.  John Walker was employed with Mr. Putnam at Southern Aroostook and previously sought to have Mr. Putnam separated from his positions.  PSAMF ¶ 118; DRPSAMF ¶ 118.  Mr. Colville was the superintendent of Southern Aroostook for four years and two months.  PSAMF ¶ 119; DRPSAMF ¶ 119.  Previously, he was a special education teacher and a special education director.  *Id.*  Mr. Colville was hired in 1987 or 1988.  *Id.*  Not once during his tenure as superintendent did Mr. Colville express concerns to Mr. Putnam that hazing was occurring on the baseball team.  *Id.*

### H.   Hazing Investigation and Findings

Based upon the complaint letter, Superintendent Doe requested that an attorney from Drummond Woodsum conduct an investigation.  DSMF ¶ 27; PRDSMF ¶ 27; PSAMF ¶ 120; DRPSAMF ¶ 120.  Board members do not recall authorizing the investigation.  PSAMF ¶ 121; DRPSAMF ¶ 121.  M. Thomas Trenholm, Esquire, and Principal Porter conducted the investigation into the alleged hazing incidents.[18] PSAMF ¶ 122; DRPSAMF ¶ 122.  Mr. Putnam was interviewed as part of the investigation and informed of the allegations.  DSMF ¶ 33; PRDSMF ¶ 33.  Mr. Trenholm also interviewed eleven of the thirteen players as well as all four adults who chaperoned the trip.[19]  DSMF ¶ 34; PRDSMF ¶ 34.  During those meetings,

---

[18]     Defendants clarified Mr. Trenholm's first name.  DRPSAMF ¶ 122.  The record supports their clarification.  The Court modified the paragraph to reflect this clarification.

[19]     Mr. Putnam moved to strike Defendants' paragraph thirty-four on the grounds that it is unsupported by the record and the report upon which it relies is inadmissible hearsay.  PRDSMF ¶ 34.  In support of their statement, the Defendants cite the entire Trenholm Report.  DSMF ¶ 34.  Motions to strike statements of fact are generally not allowed, but can be used as a vehicle for removing a fact from the Court's consideration.  *See* D. ME. LOC. R. 56(e).

members of the baseball team were coerced by being told they were an "embarrassment" and lying when they denied hazing occurred.  PSAMF ¶ 123; DRPSAMF ¶ 123.

On or about May 15, 2012, in response to the complaint letter and following an oral report on the investigation, Mr. Doe placed Mr. Putnam on administrative leave.[20]  DSMF ¶ 28; PRDSMF ¶ 28.

On May 29, 2012, Mr. Trenholm issued a report in which he concluded that hazing had occurred on the 2012 trip and on prior trips.  DSMF ¶ 34; PRDSMF ¶ 34.

---

The Court reviewed the Trenholm Report in its entirety and found the following statements:

On May 9, 2012, I individually interviewed each of the four adults who accompanied the Team on this year's trip . . . .

On May 15, 2012, I individually interviewed eleven of the thirteen players who attended this year's trip.

Based on the credible statements of the players I interviewed, I find overwhelming evidence that hazing occurred on this year's trip.  I also find that this year's incidents were more extensive than previously understood by school officials.  Furthermore, it is clear that the players who engaged in this year's initiation saw themselves as part of a longstanding tradition of scaring and hurting first-year players.

I find that not only did hazing occur multiple times on this year's trip, but it has been prevalent on past trips and that fact is widely known among players and adults alike.

*Trenholm Mem.* at 1, 1, 6, 7.  The Court concludes that this supports the Defendants' statement that Mr. Trenholm interviewed eleven of the thirteen players as well as four adults who chaperoned the trip.  The Court could not, however, locate support in the Trenholm Report for the Defendants' statement that Mr. Trenholm concluded that the adults on the trip "should have known hazing was occurring."  The Court omits that portion of the Defendants' statement.

With respect to whether the Trenholm Report constitutes inadmissible hearsay, the report is not being offered for its truth, but for the effect it had on its readers – the superintendent and the Board.  Accordingly, the report's findings are admissible to show the motives of the report's readers.  *See* FED. R. EVID. 801(c); *see, e.g.*, *United States v. Green*, 887 F.2d 25, 27-28 (1st Cir. 1989) (coconspirator's statement that victim was informer and that coconspirator had killed people before was not hearsay because it was not offered for its truth; instead, statements were used to show conspirator's motive in shooting victim, to protect the conspiracy).  The Court has included the Defendants' paragraph thirty-four.

[20]   The Court supplemented the fact with the approximate date to clarify the order in which the events occurred.  Mr. Doe testified in his deposition that he believed he put Mr. Putnam on administrative leave on May 15, 2012.  *See Doe Dep.* at 53:24-54:3.

Mr. Trenholm subsequently wrote that "furthermore Coach Putnam was aware that [] [Superintendent Doe] and the board had concerns about hazing before this year's trip." PSAMF ¶ 124; DRPSAMF ¶ 124. However, Board members never expressed concerns to Mr. Putnam about hazing on the annual spring baseball trip. PSAMF ¶ 126; DRPSAMF ¶ 126.

Mr. Trenholm also wrote Superintendent Doe a letter dated May 31, 2012 in which he concluded:[21]

> Although Coach Putnam said he was not aware of these rumors, or hazing on any trips, I found that Coach Putnam knew or should have known that hazing occurred on these trips. Notwithstanding this, Coach Putnam did nothing to stop the hazing or protect the first-year players from the annual initiations on these trips. Not only did the hazing and these initiations amount to more than mere "horseplay," the overwhelming evidence shows that first-year players were indeed hurt by this very dangerous and severe annual occurrence. Nonetheless, Coach Putnam chose to ignore all the warning signs for years and did not sufficiently act to prevent or prohibit this hazing.[22]

DSMF ¶ 35; PRDSMF ¶ 35.

Mr. Putnam knew that the district had an anti-hazing policy. DSMF ¶ 36; PRDSMF ¶ 36. Mr. Putnam knew that the Board and Mr. Doe had concerns about hazing before the 2012 trip.[23] DSMF ¶ 37; PRDSMF ¶ 37. Mr. Putnam agreed that

---

[21]     The letter was dated May 31, 2012, not March 30, 2012. *See* DSMF Attach. 10 *May 31, 2012 Letter from M. Thomas Trenholm to Superintendent Doe* (ECF No. 17-10).

[22]     Mr. Putnam moved to strike Defendants' paragraph thirty-five on the same grounds that he moved to strike paragraph thirty-four. The Court overrules Mr. Putnam's hearsay argument for the same reasons articulated in footnote nineteen. The record supports the Defendants' statement, and the Court admits it as written.

[23]     Mr. Putnam denied Defendants' paragraph thirty-seven citing Mr. Porter's deposition at page 42, lines 1 through 4:

> Q. Prior to the spring, varsity baseball spring 2012 trip, did you have any more conversations with Mr. Putnam saying, "We have concerns about hazing, you want to be really careful," anything like that?
> A. I don't recall them.

if hazing occurred on the trip, it occurred while he was responsible for supervising the students.[24]  DSMF ¶ 38; PRDSMF ¶ 38.  Mr. Putnam agreed that if hazing had become part of the culture of the baseball team that it would be a problem for the school district.[25]  DSMF ¶ 39; PRDSMF ¶ 39.

Mr. Doe's stated reason for putting Mr. Putnam on administrative leave was that Mr. Putnam failed to properly supervise students on the baseball trip during which hazing occurred.[26]  DSMF ¶ 29; PRDSMF ¶ 29.  Mr. Putnam was put on administrative leave in part because Mr. Doe believed that Mr. Putnam failed to

---

PRDSMF ¶ 37 Attach. 4 *Dep. of Jonathan C. Porter*, at 41:25-42:4 (ECF No. 20-4) (*Porter Dep.*).  First, the record evidence cited by the Defendants is Mr. Putnam's own testimony in which he acknowledged that he knew that the Superintendent and the Board had concerns about hazing before the 2012 trip. DSMF ¶ 37 Attach. 5 *Dep. of Murray Putnam*, at 108:17-25 (ECF No. 17-5) (*Murray Dep.*).  Mr. Putnam may not contradict his own admission about what he actually knew by citing testimony from someone else who could not recall what Mr. Putnam knew.  This is a frivolous objection and the Court includes Defendants' paragraph thirty-seven.

[24]      Mr. Putnam interposed a qualified response to Defendants' paragraph thirty-eight because he was unaware of any hazing on the trip.  PRDSMF ¶ 38.  The fact that he was unaware of any hazing on the trip does not effectively deny that he agreed that any hazing that happened on the trip occurred while he was responsible for supervising the students.  The Court overrules Mr. Putnam's objection and includes the statement as written.

[25]      Mr. Putnam interposed a qualified response to Defendants' paragraph thirty-nine because he did not agree that hazing was part of the culture of the baseball team.  However, paragraph thirty-nine does not say that Mr. Putnam agreed that hazing was part of the baseball team culture.  The Court considers his qualification non-responsive, overrules it, and includes the Defendants' statement as written.

[26]      Mr. Putnam denied Defendants' paragraph twenty-nine.  *See* PRDSMF ¶ 29.  He cited a portion of a declaration by Leanne White, a member of the Board, which states:

> As a School Board Member of RSU #50 I was surprised that I was not consulted before Mr. Putnam was placed on administrative leave.  In fact I was not told he was on administrative leave until the lawyers from Drummond Woodsum came.  The Board was told that the lawyers had done an investigation but we weren't allowed to ask any questions.

*White Decl.* ¶ 9.  Ms. White's statement does not contradict Defendants' paragraph twenty-nine. However, the Defendants have phrased the statement so that it may be interpreted as a legal conclusion, rather than a statement of fact.  Accordingly, the Court has altered the statement to clarify that the 2012 hazing was Mr. Doe's stated reason for placing Mr. Putnam on administrative leave, leaving open whether his stated reason was the true reason.

communicate to his players the school district's anti-hazing policies.[27]   DSMF ¶ 30; PRDSMF ¶ 30.[28,29]

Mr. Putnam believes his contracts were not renewed because the Walker family has a personal vendetta against him, because of his age, and because he was

---

[27]   Mr. Putnam interposed a qualified response to the Defendants' paragraph thirty because Mr. Doe does not know if Mr. Putnam advised the students of the hazing policy.  PRDSMF ¶ 30.

In support of their arguments, both parties cite a portion of Mr. Doe's deposition that does not discuss Mr. Putnam's communication of the hazing policy to the baseball players.  *See Doe Dep.* at 65:8-25.  In reviewing the record, both parties appear to have mis-cited the page and intended to cite Mr. Doe's testimony at page sixty-seven, lines eight through twenty-five:

> Q. So that's the basis of why he was put on administrative leave?
> A. Because he did not follow the policies and procedures outlined by RSU 50 related to hazing.
> Q. And what specific policy are you talking about? When you say hazing, is there something that - - other than what we've talked about?
> A. There's a hazing policy.
> Q. I understand that.  I also understand that your concern has been that you don't believe he communicated that hazing policy to them, to the students, because they engaged in hazing while on the trip; correct?
> A. Yes.
> Q. Is there something else about the hazing policies that you believe that Mr. Putnam violated?
> A. He's responsible to follow those policies, also.
> Q. What did he do that violated the policy?
> A. He allowed hazing to take place on the trip.

*Doe Dep.* at 67:8-25.  Viewing the evidence in the light most favorable to Mr. Putnam, the Court concludes that it supports his qualification.  The Court modified the statement to accurately reflect Mr. Doe's deposition testimony.

[28]   The Defendants' paragraph thirty-one states:

> Mr. Putnam was not put on administrative leave because of his age.  DSMF ¶ 31.

Mr. Putnam denied Defendants' paragraph thirty-one.  PRDSMF ¶ 31.  In his Complaint, Mr. Putnam has charged that he was discriminated against because of his age and therefore the Court declines to accept Defendants' paragraph thirty-one because it is a contested legal conclusion in the guise of a fact.

[29]   The Defendants' paragraph thirty-two states:

> Mr. Putnam was not put on administrative leave because he spoke out against consolidation.  DSMF ¶ 32.

Mr. Putnam denied Defendants' paragraph thirty-two.  PRDSMF ¶ 32.  In his Complaint, Mr. Putnam has charged that the school district disciplined him because he spoke out against consolidation and therefore, the Court declines to accept Defendants' paragraph thirty-two because it is a contested legal conclusion in the guise of a fact.

21

a vocal opponent of school consolidation.[30]   DSMF ¶ 52; PRDSMF ¶ 52.   Mr. Putnam also believes the Walker vendetta dates back to the early 1970s.   DSMF ¶ 53; PRDSMF ¶ 53.   Mr. Putnam acknowledges that the Trenholm Report played a role in the non-renewal of his contract.   DSMF ¶ 40; PRDSMF ¶ 40.

## I.   RSU 50 School Board Holds Public Meeting to Discuss Concerns About Mr. Putnam's Separation

When members of the public became aware that Mr. Putnam had been separated from his position, they submitted petitions to Superintendent Doe seeking his reinstatement.   PSAMF ¶ 127; DRPSAMF ¶ 127.   When that failed, community members requested a public meeting to discuss their concerns.   PSAMF ¶ 128; DRPSAMF ¶ 128.

On June 18, 2012, the Board held a special meeting and invited Mr. Putnam to be heard on the subject of the investigation.[31]   DSMF ¶ 41; PRDSMF ¶ 41; PSAMF ¶ 131; DRPSAMF ¶ 131.   Mr. Putnam did not intend to attend the meeting unless he

---

[30]     Mr. Putnam interposed a qualified response to Defendants' paragraph fifty-two because he believes age discrimination and his vocal opposition to school consolidation played a role in the nonrenewal of his contracts.   PRDSMF ¶ 52.   In support of his qualification, he cites the following paragraphs of his sworn declaration:

> 9. Terry Comeau, then the superintendent of the Southern Aroostook Community School District and I were two of the most influential voices speaking out against consolidation.
> 11. The April 2011 letter received by Scot Walker was an implied threat which was unfortunately all too real, that if I did not retire, I would be forced out.
> 15. At the time that I was separated from my positions I was 66 years old.

PDRSMF Attach. 11 *Decl. of Murray Putnam*, ¶¶ 9, 11, 15 (ECF No. 20-11) (*Putnam Decl.*).   Viewing the cited portion of Mr. Putnam's declaration in the light most favorable to Mr. Putnam, the Court concludes that he believed his contracts were not renewed because of his opposition and age.   The Court modified the statement of fact accordingly.

[31]     The Court added the date of the meeting to provide context.   The record evidence cited by the Defendants provides the date of the meeting.   *See* DSMF Attach. 11 *June 18, 2012, Maine Reg'l Sch. Unit #50 Special Sch. Bd. Mtg.* (ECF No. 17-11).

had a copy of the complaint; he requested a copy of the complaint and Mr. Doe did not give it to him, so he elected not to attend the special meeting.[32]  DSMF ¶ 42; PRDSMF ¶ 42.

Prior to the meeting, community members speaking in favor of Mr. Putnam were told to delete comments that were critical.  PSAMF ¶ 132; DRPSAMF ¶ 132. Mr. Putnam's proponents were limited to three to five minutes.  PSAMF ¶ 133; DRPSAMF ¶ 133.  The one person who spoke in opposition to Mr. Putnam, Ken Colville (Stephen Walker's father-in-law), was allowed to speak for fifteen minutes. PSAMF ¶ 134; DRPSAMF ¶ 134.  Those supporting Mr. Putnam were given three to five minutes to speak and told that their comments had to be approved in advance. PSAMF ¶ 129; DRPSAMF ¶ 129.  That was never authorized or required by the Board.  PSAMF ¶ 130; DRPSAMF ¶ 130.  Many members of the Board were troubled by the procedure followed by the Board in Mr. Putnam's case as they felt it was one-sided and not in accord with Board policies.  PSAMF ¶ 135; DRPSAMF ¶ 135.  Board members also held secret conversations concerning Board matters.[33]  PSAMF ¶ 136; DRPSAMF ¶ 136.

---

[32]    Mr. Putnam interposed a qualified response to Defendants' paragraph forty-two because he stated he would not go to the meeting without first reviewing a copy of the complaint, and a copy was not provided to him.  PRDSMF ¶ 42.  Mr. Putnam's qualification is supported by the record and provides context for his decision not to attend the board meeting.  The Court accepts his qualification and modifies the statement of fact accordingly.

[33]    The Defendants denied Mr. Putnam's paragraph 136 because the record citations establish only that a few Board members had casual discussions.  DRPSAMF ¶ 136.

In support of his paragraph 136, Mr. Putnam cited portions of the declarations of Leanne White and Nichole Cullinan, two Board members.  PSAMF ¶ 136.  In her declaration, Ms. White states:

> 11. I do not believe the RSU #50 Board followed its policies during my tenure on the Board.  I do believe that there were secret meetings between RSU 50 School Board Members.  I was so distressed by the way the Board was run that I felt compelled to

### J.     Larry Malone Hired as RSU 50 Superintendent

On July 1, 2012, RSU hired Larry Malone as its superintendent.  DSMF ¶¶ 11, 45; PRDSMF ¶¶ 11, 45; PSAMF ¶ 137; DRPSAMF ¶ 137.  Before that time, Mr. Malone was the principal at the Mattanawcook Junior High School in Maine School Administrative District 67.  DSMF ¶ 12; PRDSMF ¶ 12.  He had been the principal, and Mr. Putnam's supervisor, at Southern Aroostook from 1993 to 2000.  PSAMF ¶ 138; DRPSAMF ¶ 138.  During the seven years that Mr. Malone was Mr. Putnam's supervisor he did not have any concerns that there was hazing on the baseball team.  PSAMF ¶ 139; DRPSAMF ¶ 139.  Mr. Malone believed if there was any hazing, Mr. Putnam would have stopped it.  PSAMF ¶ 140; DRPSAMF ¶ 140.

In July 2012, shortly after Mr. Malone became superintendent, Mr. Putnam asked for a meeting.  PSAMF ¶ 141; DRPSAMF ¶ 141.  Mr. Malone met with Mr.

---

resign, however I moved and was no longer able to sit on the board so [it] was not necessary to resign my position.

*White Decl.* ¶ 11.  In her declaration, Ms. Cullinan states:

> 7.  My understanding of what we were supposed to do on the RSU #50 Board was to discuss important issues concerning our communities and children.  Discussions are supposed to have a beginning, middle, and an end.  The discussions on the RSU #50 Board only had an end, we were told the issue, how to vote, then voted.  I believe it was a colossal waste of time designed to give the appearance of community involvement when in fact the Board was being run by the Walkers.

> 9.  I was on the Board when Mr. Gordon and others sought to make a presentation on Mr. Putnam's behalf.  The Board never discussed and never voted on any pre-requirements or limitations of comments.  To extend that, the public had to have their comments approved or their speaking time was limited, it was not done by vote or agreement of the full Board.

*Cullinan Decl.* ¶¶ 7, 9.

Viewing the evidence in the light most favorable to Mr. Putnam, the Court concludes it is sufficient to support a slightly modified version of his statement; however, there is no record support for the idea that the conversations were "unsanctioned" or "illegal."  The Court admits the statement as modified to more accurately reflect the record.

Putnam twice that month regarding his employment with RSU 50 – once alone and once with Mr. Porter.  DSMF ¶¶ 46, 47; PRDSMF ¶¶ 46, 47.  During those meetings, Mr. Malone gave Mr. Putnam the opportunity to respond to the hazing investigation, and was interested in whether there would be a compromise in regards to the baseball team spring trip and to the hazing, an issue that had been very divisive in the community.[34]  DSMF ¶ 49; PRDSMF ¶ 49.

During the first meeting, Mr. Putnam told Mr. Malone that he believed the situation had been mishandled and that it arose out of an ongoing long history with the Walker family.  DSMF ¶ 48; PRDSMF ¶ 48.  Mr. Putnam asked to be re-appointed as the varsity baseball coach and the athletic director.  PSAMF ¶ 142; DRPSAMF ¶ 142.  Mr. Malone responded by asking "How much longer do you want to do this?" PSAMF ¶ 143; DRPSAMF ¶ 143.  Mr. Malone was not aware of Mr. Putnam's position on consolidation until July 2012.  DSMF ¶ 13; PRDSMF ¶ 13.  Mr. Malone had not seen the anonymous letter before this lawsuit.  DSMF ¶ 56; PRDSMF ¶ 56.

### K.  Mr. Putnam Not Reappointed as Athletic Director or Varsity Baseball Coach

Mr. Putnam was not re-appointed as the athletic director or varsity baseball coach.  PSAMF ¶ 144; DRPSAMF ¶ 144.  Instead, on Principal Jonathan Porter's recommendation, Mr. Malone appointed Mr. Porter himself, then forty years old, to

---

[34]      Mr. Putnam interposed a qualified response to Defendants' paragraph forty-nine on the ground that Superintendent Malone did not work to rectify the situation.  Mr. Putnam's qualification does not directly address the statement in Defendants' paragraph forty-nine, but it raises the issue of whether the statement of fact is adequately supported by the record.  The Court reviewed the record, concluded that it did not entirely support the proposed statement of fact, and modified the statement of fact to more accurately reflect the record.

be athletic director and Mr. David Day, also in his forties, to be varsity baseball coach.[35]  DSMF ¶¶ 50, 51; PRDSMF ¶¶ 50, 51; PSAMF ¶ 145; DRPSAMF ¶ 145.

At the time Mr. Putnam was separated from his positions he was sixty-six years old.  PSAMF ¶ 146; DRPSAMF ¶ 146.  When Mr. Malone advised Mr. Putnam that he would not be re-appointed to the positions he had held for forty-four years (varsity baseball coach) and thirty-nine years (athletic director), the Board, not the Superintendent, had the authority to appoint co-curricular positions.[36]  PSAMF ¶ 90; DRPSAMF ¶ 90.

## III.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion

#### 1.   Municipal Liability

The Defendants argue that they are entitled to summary judgment on Counts I, II, and III because Mr. Putnam cannot meet the standard required for the imposition of municipal liability.  *Defs.' Mot.* at 6.  Defendants submit that without evidence of a discriminatory policy or widespread discriminatory practice, RSU 50 may not be held liable under 42 U.S.C. § 1983 for its employees' conduct.  *Id.*  Here, Defendants contend, Mr. Putnam has neither alleged nor presented evidence that RSU 50 had a policy or custom in place that resulted in retaliation against Mr.

---

[35]    Mr. Putnam interposed a qualified response to Defendants' paragraph fifty because Mr. Malone appointed Mr. Porter, then forty years old, to be the athletic director and Mr. David Day, who was also in his forties, to be the varsity baseball coach.  PRDSMF ¶ 50.  The record supports Mr. Putnam's qualification and the Court modifies the statement of fact accordingly.

[36]    Viewing the evidence in the light most favorable to Mr. Putnam, the Court concludes that there is a genuine dispute about the authority of the school board and the superintendent vis-a-vis the appointment and nonrenewal of coaches and co-curricular positions and the Court has accepted the non-movant's statement.  *See* footnote 8, *supra*.

Putnam in violation of his First Amendment or due process rights. *Id*. at 7. Further, they argue, the nonrenewal of Mr. Putnam's contracts may not be considered official policy; although the Board had the ultimate policymaking authority regarding nondiscriminatory hiring practices, it was the superintendent who declined to nominate or appoint Mr. Putnam. *Id*. at 7-8. Thus, Defendants contend, Mr. Putnam has failed to allege anything more than a respondeat superior theory of liability, which is insufficient to establish municipal liability. *Id*. at 8.

### 2.   Retaliation Claim

Defendants contend that they are entitled to summary judgment on Count I because Mr. Putnam cannot establish either a prima facie case of retaliation or pretext. *Id*. They point out that although Mr. Putnam began speaking out against school consolidation in 2007 and continued to express his opposition through 2011, his employment contracts were renewed every year through 2012. *Id*. at 9. Additionally, they state, several RSU 50 employees expressed reservations about school consolidation, some still employed by the school district. *Id*. Significantly, they argue, Mr. Doe and Mr. Malone were responsible for appointing or nominating Mr. Putnam; both were hired after consolidation occurred and neither was aware of Mr. Putnam's opposition to consolidation. *Id*.

Even if Mr. Putnam can establish a prima facie showing of retaliation, Defendants argue, he cannot establish pretext because the record evidence makes clear that his contracts were not renewed because of the tradition of hazing on the baseball team under his supervision. *Id*. at 10. Mr. Doe testified that he placed Mr.

Putnam on administrative leave for failure to properly supervise students and failure to communicate the district's anti-hazing policy to his players. *Id.* Furthermore, they submit that Superintendent Malone declined to appoint or nominate Mr. Putnam for renewal because of the hazing incident, not because of Mr. Putnam's opposition to school consolidation. *Id.*

### 3. Section 1983 Claim for Violation of Maine's Open Meeting Law

Defendants submit that they are entitled to summary judgment on Count II because: (1) Mr. Putnam cannot hurdle the municipal liability standard with respect to his claim against RSU 50, and there is no suggestion that either of the individual Defendants was involved in the alleged secret meetings; (2) § 1983 does not provide a remedy for a violation of a state open meeting law; (3) Mr. Putnam's claim, brought nearly two years after the superintendent declined to reappoint him, is a "thinly veiled attempt to circumvent" the statute of limitations applicable to violations of Maine's Freedom of Access Act (FOAA), and is untimely; and, (4) there is no evidence that the school board held any secret meetings in violation of FOAA. *Id.* at 10-11.

### 4. Due Process Claim

Defendants submit that the nonrenewal of Mr. Putnam's contracts did not violate his due process rights. *Id.* at 11. First, they argue that Mr. Putnam was provided adequate due process because: (1) he was interviewed as part of the hazing investigation; (2) the Board held a special meeting, which Mr. Putnam declined to attend, to discuss the investigation and Mr. Putnam's employment; and, (3) Mr. Putnam met twice with Superintendent Malone before the superintendent appointed

28

others to the coach and athletic director positions.  *Id.* at 11-12.  Second, Defendants insist that Mr. Putnam cannot establish a property interest in his continued employment required to maintain a due process claim.  *Id.* at 12.  Coach and athletic director, Defendants state, are not protected positions and there is no evidence that RSU 50 or the Department of Education had any policy or rule regarding ongoing employment of coaches and athletic directors.   *Id.*   Defendants assert that Mr. Putnam's claim that he had an "implicit agreement" with the school district to extend his employment until he was ready to retire is not supported by any evidence and is, in any case, unenforceable.  *Id.*

### 5.    Age Discrimination Claim

Defendants maintain that they are entitled to summary judgment on Count IV because Mr. Putnam cannot establish a prima facie showing of age discrimination, nor can he prove pretext.  *Id.* at 13.  They argue that the record is "clear" that Mr. Putnam did not meet all legitimate job expectations, as evidenced by the tradition of hazing on the baseball team.  *Id.* at 14.  Specifically, they contend that Mr. Putnam knew that the Board and Superintendent Doe had concerns about hazing before the April 2012 trip, that Principal Porter articulated those concerns, that if hazing had become a part of the baseball team culture it would be a problem for the school district, and that the hazing investigation report played a role in the nonrenewal of his contracts.  *Id.*  Further, Defendants contend, their stated reason for not renewing Mr. Putnam's contract was his role in the baseball team hazing.  *Id.*

29

Next, Defendants argue that even if Mr. Putnam can establish a prima facie age discrimination claim, he has provided no evidence of pretext. *Id.* The anonymous letter demanding Mr. Putnam's retirement, Defendants contend, is potentially inadmissible, is not probative of Mr. Doe or Mr. Malone's motive for declining to reappoint Mr. Putnam, and did not play a role in Superintendent Malone's decision because he had not seen the anonymous letter before this lawsuit. *Id.* at 14-15.

**B.   Murray Putnam's Response**

**1.   Municipal Liability**

Mr. Putnam concedes that the respondeat superior theory of liability is unavailable to him, but he maintains that the Board systematically failed to follow its own policies, leading to constitutional violations and forming a basis for imposing liability. *Pl.'s Opp'n* at 19.

**2.   Retaliation Claim**

Mr. Putnam maintains that he has demonstrated that his vocal opposition to consolidation was as a citizen and was protected speech. *Id.* at 11. Further, he states, there is no question he was forced out of his position within a year of the school consolidation. *Id.*

He acknowledges that there is no direct evidence that he was forced out because of his opposition but contends he has presented ample circumstantial evidence to support his claim. *Id.* First, he argues, Scot Walker unnecessarily presented the anonymous letter to the school administration, sending a clear message to Mr. Putnam that his opposition would cost him his job. *Id.* Second, Mr. Putnam

contends that in August 2011, Mr. Knowles, who had never met Mr. Putnam, voiced reservations about and ultimately voted against approving him to the athletic director and baseball coach positions because "he was a 'controversial figure' in the community." *Id.* at 12.  Third, Mr. Putnam contends that it is reasonable to infer that he and Mr. Comeau were singled out because they were the strongest, most influential individuals in the Southern Aroostook school district and were opposed to consolidation. *Id.*

Next, Mr. Putnam attacks the hazing investigation undertaken by Mr. Trenholm at the school's request, arguing that the Trenholm Report is supported only by inadmissible hearsay evidence and that the Defendants have submitted no affidavits, declarations, or depositions of the individuals who claim to have been hazed and who informed Mr. Putnam of the hazing.  *Id.* at 12-13.  Further, he contends, the report's conclusions are tainted by bias because it was completed by a law firm that represents the school district in this case.  *Id.* at 13.

Even if the Court considers the report, Mr. Putnam argues, it is flawed for three reasons: (1) it states that the Board told Mr. Putnam to be wary of hazing on the 2012 trip when none of the Board members recall doing so; (2) none of the administrators who supervised Mr. Putnam, including Mr. Porter, Mr. Malone, and Mr. Comeau, ever advised him of any hazing concerns; and (3) the investigation was results-driven – two parents found the investigators' questioning of their children coercive and offensive.  *Id.*  Mr. Putnam contends that the report is mere pretext used to force him from his positions.  *Id.*  He maintains he has presented sufficient,

31

admissible evidence that parents of children on the trip said they did not see hazing or report it to Mr. Putnam, and that if anything untoward were to happen that he would take appropriate action. *Id*. at 13-14.

> ### 3. Section 1983 Claim for Violation of Maine's Open Meeting Law

Mr. Putnam contends that he has presented sufficient evidence to demonstrate that the Board violated his right to petition and right to freedom of association when it held secret meetings in violation of RSU 50 school board policy and 1 M.R.S. § 403. *Id*. at 14. In support of his argument, Mr. Putnam points to evidence of three conversations among Board members that occurred outside public Board meetings and while matters concerning his employment were before the Board. *Id*. at 14-15. He asserts that his only opportunity to seek redress for these meetings is through a § 1983 action. *Id*. at 15.

> ### 4. Due Process Claim

Mr. Putnam argues that his due process rights were violated by the Board when it did not follow its own policies on open meetings, public comment at meetings, and appointment of coaching and co-curricular positions. *Id*. He maintains that the Board had policies in place that governed its approach to these three issues, and that the existence of those policies creates a constitutionally-protected interest and obligation to follow the policies. *Id*. at 15-16. Turning to the special meeting of the Board, Mr. Putnam asserts that community members were told they had to submit their statements before the meeting and instructed to limit their comments to three to five minutes, and some community members were asked to change their

statements. *Id*. at 16. Mr. Putnam contends that none of these requirements is set forth in the RSU 50 school board policies. *Id*.

Finally, Mr. Putnam submits that the Board, not the superintendent, was authorized to appoint the athletic director and baseball coach, and that Mr. Malone's unilateral appointment of Mr. Porter as athletic director and Mr. Day as baseball coach, without the approval of the full Board, violated Mr. Putnam's due process rights. *Id*. at 17.

### 5.      Age Discrimination Claim

Mr. Putnam rejects the Defendants' assertions that he has failed to meet his burden of demonstrating that he met legitimate job expectations and that he therefore failed to make a prima facie showing of age discrimination. *Id*. He contends that Defendants have presented no direct evidence that any hazing occurred. *Id*. at 18. Mr. Putnam restates his argument that the Trenholm Report is inadmissible and biased, and it is merely pretext for separating him from his positions with RSU 50. *Id*. He further argues that age was a factor in the decision to force him from his positions, as evidenced by: (1) the anonymous letter that called him old and obstinate; (2) Mr. Porter's statement to the Board in 2009 that he could do Mr. Putnam's job if he retired; and (3) Mr. Malone's question to Mr. Putnam in the summer of 2012 asking how long he wanted to continue working. *Id*.

### C.      The Defendants' Reply

### 1.      Municipal Liability

33

The Defendants reply that Mr. Putnam has offered no evidence that an unconstitutional RSU 50 policy or custom resulted in his nonrenewal, and thus there are no grounds for liability under § 1983.  *Defs.' Reply* at 1.  Furthermore, they argue, Mr. Putnam has failed to show a causal link between any action of the Board and the nonrenewal of his contracts.  *Id*. at 2.  The Defendants assert it is undisputed that the superintendent, not the Board, decided not to renew Mr. Putnam's contracts, and municipal liability does not exist if the conduct of the school board is unrelated to the employment action.  *Id*. at 1-2.  The Defendants conclude that RSU 50 is entitled to summary judgment on all counts.  *Id*. at 2.

## 2. Retaliation Claim

The Defendants maintain that Mr. Putnam has failed to establish a causal link between his opposition and his nonrenewal.  *Id*.  They contend that the evidence Mr. Putnam points to in support of his argument – the anonymous letter that makes no reference to consolidation, a school board member calling Mr. Putnam a "controversial figure," and an alleged but unsupported claim of a district-wide conspiracy to quash opposition to consolidation – fails to establish causation because Mr. Malone was the person who decided not to renew Mr. Putnam's contracts and Mr. Malone was completely unaware of Mr. Putnam's opposition to consolidation before July 2012.  *Id*. at 2-3.

Even if Mr. Putnam has established a prima facie claim of retaliation, Defendants contend, he has not denied that Superintendent Malone's decision was motivated by the hazing incident.  *Id*. at 3.  The Defendants argue that they are not

offering the Trenholm Report for the truth of the matter asserted, but instead for its impact on its readers and ultimate decisionmakers regarding Mr. Putnam's employment: the superintendents. *Id.* at 3 n.3.

### 3. Section 1983 Claim for Violation of Maine's Open Meeting Law

The Defendants reply that they are entitled to summary judgment on Count II because there is no evidence that the Board violated FOAA's open meeting requirement when members had informal discussions regarding Mr. Putnam, and because a FOAA violation is not actionable as a § 1983 claim. *Id.* at 4. The Defendants insist that FOAA claims must be brought under Maine Rule of Civil Procedure 80B. *Id.*

### 4. Due Process Claim

The Defendants reject Mr. Putnam's argument that he had a property interest in continued employment, and insist that Mr. Putnam had no property interest beyond his expired, one-year contracts. *Id.* at 5. Even if Mr. Putnam had a property interest, Defendants say, he was given ample opportunities to respond to the hazing allegations – despite any procedural defects in the Board's public hearing – and met twice with Superintendent Malone to discuss his potential reappointment. *Id.*

### 5. Age Discrimination Claim

The Defendants urge that Mr. Putnam has introduced no direct evidence of age discrimination and no admissible evidence that the hazing allegations were pretext for age discrimination. *Id.* at 7. Specifically, they contend, stating an employee is "set in his ways" or asking him how long he would like to work do not constitute direct

evidence of age discrimination.  *Id*. at 6-7.  Defendants also clarify that Mr. Porter stated only that he could absorb Mr. Putnam's vice principal responsibilities if the position were eliminated.  *Id*. at 7.  Finally, Defendants contend that statements made by parents of baseball team players are inadmissible because they have no personal knowledge of whether hazing occurred.  *Id*.

## IV.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id*. (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

"If the moving party has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. Appx. 328, 332 (1st Cir. 2007) (quoting *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal punctuation omitted).  In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll*

36

*v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

The Supreme Court has stated that "the plain language of Rule 56(c) mandates the entry of judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## B.   Actions Pursuant to 42 U.S.C. § 1983

The plain language of 42 U.S.C. § 1983 grants to individuals a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by those acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must demonstrate: (1) "the challenged conduct is attributable to a person acting under color of state law"; and (2) "the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Freeman v. Town of Hudson*, 714 F.3d 29, 37 (1st Cir. 2013) (quotation and citation

omitted).  "Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983."  *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004).

## C.    Count I: Retaliation in Violation of 42 U.S.C. § 1983[37]

"The First Amendment guarantees the 'public interest in having free and unhindered debate on matters of public importance.'"  *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 66 (1st Cir. 2015) (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 573 (1968)).  This guarantee applies to government employees as well, who should not "suffer reprisal from a government official for engaging in protected speech because of the possible chilling effect against the free exercise of constitutional rights."  *Rosaura*, 778 F.3d at 66.  The First Circuit has held, "as a general matter, 'claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983.'"  *Rosaura*, 778 F.3d at 66 (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 9 (1st Cir. 2005)).

### 1.    The Prima Facie Case

To prevail on a § 1983 claim of retaliation for activity protected by the First Amendment, a plaintiff must demonstrate: (1) that he engaged in constitutionally-protected speech; and, (2) that the protected speech was a substantial or motivating factor in the adverse employment action taken against him by the defendant.  *See Wytrwal v. Saco Sch. Bd.,* 70 F.3d 165, 170 (1st Cir. 1995).  To establish that his conduct was constitutionally protected under the first prong of this analysis, a public

---

[37]    Mr. Putnam's Complaint gave Messrs. Doe and Malone fair notice that they were being sued in their official and individual capacities, so the Court considers Mr. Putnam's claims against them. *See Powell v. Alexander*, 391 F.3d 1 (1st Cir. 2004).

employee must meet two requirements. *Rosaura*, 778 F.3d at 66-67. First, the employee must establish that he was speaking "as a citizen on a matter of public concern." *Id.* at 66 (internal citation omitted). Second, "the First Amendment protection of the speech must outweigh the government's interest as an employer."[38] *Id.* at 67.

Next, in order to satisfy the second prong of the analysis, the "motivation prong," the employee must produce "'sufficient direct or circumstantial evidence' that his constitutionally protected conduct was the driving factor that caused the retaliation." *Id.* (quoting *Diaz-Bigio v. Santini*, 652 F.3d 45, 51 (1st Cir. 2011)). The plaintiff's burden in establishing this prong "is more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case." *Id.* (internal citation omitted). However, for this prong, summary judgment will only be granted as a matter of law to the defendant "if (1) the record evidence *compelled* the conclusion that the plaintiff would have [suffered the adverse employment action] in any event for nondiscriminatory reasons, or (2) the plaintiff did not introduce sufficient evidence in the first instance to shift the burden of persuasion to the defendants." *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003) (emphasis in original) (quoting *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)).

The Court must first identify the portion of Mr. Putnam's speech that was constitutionally protected. *See Rosarua,* 778 F.3d at 67 ("[I]t is vital for any claim to

---

[38]    This inquiry is known as the *Pickering* balancing test. *See Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 180 (1st Cir. 2011).

clearly present the protected activity on which it is premised"). Here, the speech at issue consists of Mr. Putnam's vocal and ongoing opposition to school consolidation from 2007 to 2011.

With respect to the first part of the first prong, the parties do not dispute that Mr. Putnam spoke out against school consolidation as a citizen or that his speech was on a matter of public concern. Neither submits any argument on the *Pickering* balancing requirement – the second part of the first prong addressing the need to weigh protected speech against the government's interest as employer – and the Court does not explore that issue further.[39]

Turning to the second "motivation" prong of the analysis, the parties dispute whether Mr. Putnam has presented sufficient circumstantial evidence to demonstrate that his speech was the cause of the retaliation.[40] The Defendants submit that Mr. Putnam's contracts were renewed during the time he spoke in opposition to consolidation, that other employees opposed to consolidation were still employed by the school district, and that both Messrs. Doe and Malone, who were responsible for appointing Mr. Putnam, were hired after consolidation occurred. *Defs.' Mot.* at 9. In response, Mr. Putnam contends that: (1) Mr. Knowles, then-chair of the Board, voted against his reappointment in August 2011 because Mr. Putnam

---

[39] On June 19, 2014, the United States Supreme Court decided *Lane v. Franks*. *Lane v. Franks*, 134 S. Ct. 2369 (2014). The Court concludes *Lane* does not apply here for at least three reasons. As *Lane* is based on the *Pickering* factors and the parties have not raised the *Pickering* balancing test, the Court has not considered it. *See Rodriguez*, 659 F.3d at 180 n.8. Further, the *Lane* Court focused on whether the plaintiff's testimony was made as a citizen, but there is no dispute here that Mr. Putnam was speaking as a citizen. Finally, *Lane* addressed whether the plaintiff in that case was offering sworn testimony, and there is no evidence that Mr. Putnam was doing so.

[40] Mr. Putnam concedes he has no direct evidence that he was not reappointed because of his opposition to consolidation. *Pl.'s Opp'n* at 11.

was controversial; (2) the anonymous letter sent immediately after the vote on consolidation; and, (3) the timing of Mr. Putnam's nonrenewal – within a year of consolidation – is circumstantial evidence of causation. *Pl.'s Opp'n* at 11-12. The Defendants counter that none of Mr. Putnam's evidence amounts to a prima facie claim of retaliation because Mr. Malone was the person who decided not to renew Mr. Putnam's contracts. *Defs.' Reply* at 2-3.

The Defendants lean heavily on their contention that Mr. Malone, who Defendants insist knew nothing about Mr. Putnam's position on consolidation and who alone was responsible for the nonrenewal of Mr. Putnam's contracts, acted solely for reasons other than Mr. Putnam's opposition. The Court is unpersuaded. First, Mr. Malone was not the only person involved in the decisions regarding Mr. Putnam's contracts. Mr. Doe put Mr. Putnam on administrative leave. Second, viewing the record and all reasonable inferences drawn from it in the light most favorable to Mr. Putnam, the Court concludes that there is a genuine issue of material fact as to whether Mr. Doe knew about Mr. Putnam's opposition.[41] Third, Mr. Knowles voted

---

[41]    In his deposition, Mr. Doe was questioned about the community meeting held in late 2011 where consolidation was discussed:

> Q. And you remember Mr. Putnam being at that meeting?
> A. I do.
> . . .
> Q. The meeting that you recall that Mr. Putnam attended, did he speak out against consolidation?
> A. I know he was there, and I know he spoke, but - -
>    (Shrugging shoulders.)
> . . .
> Q. And I know that you don't know exactly what Mr. Putnam might have said in that meeting. Do you recall whether he spoke against the RSU or not?
> A. I don't recall.

against Mr. Putnam's reappointment in August of 2011 – at a meeting that Mr. Doe would have attended in his role as superintendent – because Mr. Putnam was "controversial."

Fourth, the timing of the nonrenewal of Mr. Putnam's contracts is not as neutral as Defendants contend.  It is undisputed that Mr. Putnam's opposition to consolidation extended through 2011, and that Mr. Putnam's contract was renewed each year until June 2012, during which time that Mr. Putnam spoke out against consolidation.  Mr. Putnam's contracts lasted for one-year terms, and his 2011-2012 contract was set to expire at the end of June 2012.  That would mean that his 2011-2012 contract began at the end of June 2011.[42]  RSU 50 was not formed until July 11, 2011, however, which was presumably after Mr. Putnam's contract had been renewed for the 2011-2012 school year.  The next opportunity to renew his contract would thus have been in June 2012, when it was not renewed.  Although the timing of the nonrenewal does not carry the day for Mr. Putnam,[43] it is, in conjunction with other evidence on record, at least suggestive of a relationship between Mr. Putnam's vocal opposition to consolidation and the nonrenewal of his contracts.

Finally, the record evidence demonstrates that the atmosphere in the district at that time was partisan and contentious, and Mr. Putnam was on the side that

---

*Doe Dep.* at 17:19-18:14.  A jury could conclude that as he was at the meeting, as the consolidation issue was controversial, and as Mr. Putnam, an administrator, coach, and teacher, spoke vigorously against consolidation at the meeting, Mr. Doe must have heard what Mr. Putnam said.  A jury could decide not to believe Mr. Doe's testimony that he has no recollection about what Mr. Putnam said.

[42]      Neither of the parties submitted copies of Mr. Putnam's contract, so the Court's conclusion represents a logical inference based upon other record evidence.

[43]      Temporal proximity is one method of proving the causal element of a retaliation claim; a lack of temporal proximity weakens, but does not doom a plaintiff's case.

ultimately lost.  Although the Defendants point out that other employees were opposed to consolidation and kept their jobs, it is unclear which employees Defendants refer to, whether their opposition to consolidation was as vocal and public as Mr. Putnam's opposition, whether they and Mr. Putnam had the same type of contracts, and whether they occupied more protected positions.  Furthermore, Mr. Comeau, another of the most influential opponents of consolidation, was only offered a five-month term as superintendent.  When Mr. Comeau turned that offer down, his successor Mr. Doe was offered a one-year term as interim superintendent.

A rational factfinder could conclude that the leadership of the newly-consolidated RSU 50 wanted Mr. Putnam – a vocal opponent of consolidation – out of his job.  Ultimately, the record evidence undermines the Defendants' positions that Mr. Malone and/or Mr. Doe acted alone, and that neither knew anything about Mr. Putnam's position on consolidation.  For the purposes of summary judgment, the Court concludes that Mr. Putnam has presented a genuine issue of material fact as to whether his vocal opposition to consolidation was a substantial or motivating cause in the refusal to renew his contracts.[44]  In other words, Mr. Putnam has generated a

---

[44]    The Defendants go into some detail about the First Circuit's decision in *Wytrwal* but do not explain that case's relevance.  *See Defs.' Mot.* at 9.  *Wytrwal* does not carry the Defendants' argument very far, however, for two reasons.  First, *Wytrwal* was decided after a full trial.  *See Wytrwal*, 70 F.3d at 168.  Second, the First Circuit upheld the District Court's finding that the plaintiff's protected conduct was a "motivating" factor behind the defendant's decision not to rehire her, but also upheld the District Court's factual finding that the defendants had carried their burden that they would not have renewed the plaintiff's contract even in the absence of the protected conduct.  *See id.* at 170-71.  The First Circuit concluded that the credit given to the defendant's testimony regarding the plaintiff's job performance was "within the discretion of the factfinder . . . ."  *Id.* at 171.  Here, the record evidence supports the conclusion that a reasonable jury could find that Mr. Putnam's protected speech was the driving force behind the Defendants' decision not to renew his contract.  Simply because another reason could be a motivating factor does not provide the Defendants with a victory at summary judgment.  Furthermore, in contrast to *Wytrwal*, the Defendants have not established that there is no

genuine dispute of material fact with respect to whether Messrs. Doe and Malone were motivated to do what they did, in part or in whole, because of his protected speech.  The Court concludes that Mr. Putnam has presented sufficient evidence to satisfy his burden of demonstrating a prima facie case of First Amendment retaliation.

### 2.   The *Mt. Healthy* Defense

The Defendants now have an opportunity to show "by a preponderance of the evidence that [they] would have reached the same decision . . . even in the absence of the protected conduct." *Wytrwal v. Saco Sch. Bd.,* 70 F.3d 165, 170 (1st Cir. 1995) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). Specifically, a defendant is required to show at summary judgment that the "record would compel a reasonable jury to find that the adverse action *would have occurred* anyway, not merely that such action *would have been warranted* anyway." *McCue v. Bradstreet*, __ F.3d __, No. 14-1922, 2015 WL 4366589, at *11 (1st Cir. July 16, 2015). This defense "ensures that a plaintiff is not put 'in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.'" *Id*. at *10 (quoting *Mt. Healthy*, 429 U.S. at 285).

The Defendants' sole evidence supporting their decision to put Mr. Putnam on administrative leave and not to renew his contract is the Trenholm Report.  To the Defendants' credit, the report was issued following an investigation by the school district's attorney.  The report concluded that hazing occurred on the spring 2012

---

genuine issue of material fact as to whether they would not have renewed Mr. Putnam's contract even in the absence of the protected conduct.

trip, and that Mr. Putnam knew or should have known about the hazing. This supplies a basis for concluding that the action taken against Mr. Putnam was for a legitimate reason and was warranted.

The report is not without its weaknesses, however. Notably, it is essentially the Defendants' sole source of hazing evidence. Furthermore, Mr. Putnam has raised legitimate factual disputes about the validity of the report's facts and conclusions. For example, the parties do not dispute that members of the baseball team were coerced in meetings held as part of the hazing investigation. They were told they were an "embarrassment" and that they were lying when they denied that hazing occurred. Moreover, Mr. Porter participated in the investigation, and later helped Mr. Malone find replacements for Mr. Putnam and one of those replacements was Mr. Porter himself. Finally, the circumstances surrounding the May 7, 2012 hazing letter, which set the investigation in motion, are troubling. None of the three people who signed the letter had children on the baseball team. One is the father of a member of the RSU 50 Board, and is from a family with a long-standing conflict with Mr. Putnam.

In sum, Mr. Putnam has argued and presented sufficient evidence, which if believed, suggests that the investigation and the process by which he was terminated were biased and flawed, and the Defendants have offered no evidence to show how they handle issues with other employees who have failed to properly implement their policies. This case presents an intensely fact-oriented dispute, and the Court concludes that the Defendants have not demonstrated that there is no genuine issue

45

of material fact as to whether that they would have reached the same decision even in the absence of Mr. Putnam's protected conduct.

### 3.    Pretext

Even if the Defendants met their burden of demonstrating the *Mt. Healthy* defense, the Court concludes that the record contains credible evidence creating a genuine issue of material fact as to whether the reasons advanced by the Defendants are a pretext for retaliatory conduct in violation of Mr. Putnam's First Amendment rights.  It is for a factfinder to determine whether Messrs. Doe and Malone would have taken the same action in the absence of Mr. Putnam's protected speech.  It is possible that they took action against Mr. Putnam because of his vocal opposition to school consolidation, but it is also possible that they took action because Mr. Putnam violated RSU 50 policy.  It is for a jury, not for this Court, to resolve these conflicting factual and credibility issues.  The Court denies the Motion for Summary Judgment as to Defendants Doe and Malone on Count I.[45]

### 4.    Municipal Liability on Count I[46]

Plaintiffs face "additional requirements" in order to establish liability against a municipal defendant.  *Freeman v. Town of Hudson*, 714 F.3d 29, 37 (1st Cir. 2013). "In an action pursuant to 42 U.S.C. § 1983, there can be no municipal liability under

---

[45]    Neither of the parties raised or briefed qualified immunity and the Court considers that issue waived for the purposes of this Order.

[46]    The Defendants argue that Mr. Putnam cannot establish municipal liability under § 1983 on Counts I, II, and III, and that they are entitled to summary judgment on those Counts.  *Defs.' Mot.* at 6-8.  However, they do not provide any municipal liability arguments regarding Counts II and III.  The only municipal liability argument Defendants articulate is related to Count I – whether liability for Mr. Putnam's termination can be attributed to RSU 50.  Therefore, the Court only considers Defendants' municipal liability argument on Count I, and analyzes the Board's liability on Counts II and III.

a respondeat superior theory." *Fabiano v. Hopkins*, 352 F.3d 447, 452 (1st Cir. 2003) (quoting *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–95 (1978)).  Put differently, "[a] municipality cannot be held liable *solely* because it employs a tortfeasor . . . ." *Monell*, 436 U.S. at 691 (emphasis in original).  Therefore, a plaintiff must show that the municipality itself is responsible for the denial of rights, and "liability attaches to a municipality under § 1983 'only if the violation occurs pursuant to an official policy or custom.'" *Rodriguez–Garcia v. Miranda–Marin*, 610 F.3d 756, 769 (1st Cir. 2010) (quoting *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008)); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1998) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights").

Isolated acts by government employees may also provide for municipal liability, however, as "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Praprotnik*, 485 U.S. at 123; *see also Welch*, 542 F.3d at 942 ("Although liability may not be imposed on a municipality for a single instance of misconduct by an official lacking final policymaking authority, 'it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances'") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (plurality opinion)) (internal citation omitted).

"A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused by a formal decision of a municipal

47

legislative body, or by a person with final policymaking authority." *Welch*, 542 F.3d at 941 (internal citation omitted). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481.

The Supreme Court set forth the process for determining where policymaking authority lies for the purposes of § 1983 liability:

> Reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal citations and quotations omitted). Whether an official "has this requisite level of specific policymaking authority is a matter of state law." *Walden v. City of Providence*, 596 F.3d 38, 55-56 (1st Cir. 2010).

Under Maine law, a superintendent does not have final policymaking authority, and instead "enforce[s] or cause[s] to be enforced all the rules of the school board." 20-A M.R.S. § 1055(7); *see also Craig v. Maine Sch. Admin. Dist. No. 5*, 350 F. Supp. 2d 294, 297 (D. Me. 2004) ("[U]nder Maine law, a school superintendent does not have the authority to develop and implement employment practices . . ." and therefore cannot be considered a final policymaker for the purposes of municipal

48

liability).  In contrast, a school board has the authority to "adopt policies that govern the school administrative units."  20-A M.R.S. § 1001(1-A).  In matters of employment, the fact that a superintendent has "discretionary and final authority to make the decision in question does not necessarily mean that he was a 'policymaker' with respect to that decision."  *Craig*, 350 F. Supp. 2d at 297; *see also Pembaur*, 475 U.S. at 483 n.12.  To demonstrate that a superintendent possesses final policymaking authority, a plaintiff must establish that the school board in fact specifically delegated its authority in this area.  *See, e.g., Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 30 n.21 (1st Cir. 2005) (determining that a public safety commissioner "clearly was such a final policymaker . . . as . . . he had been delegated broad policymaking authority over [police department] procedures by the municipality"); *Charette v. Maine Sch. Admin. Dist. No. 27*, 2005 WL 914763, at *4 (D. Me. Jan. 31, 2005); *Craig v. Maine Sch. Admin. Dist. No. 5*, 350 F. Supp. 2d 294, 297 n.2 (D. Me. 2004).

The Defendants argue that the Board had ultimate policymaking authority regarding nondiscriminatory hiring practices, whereas Mr. Putnam submits it is unclear whether the Board retained that authority or whether it delegated that authority to the superintendent.  The parties appear to agree that the Board possesses the ultimate policymaking authority unless it specifically delegated that authority to the superintendent.  Therefore, Mr. Putnam must produce some evidence in order to create a triable issue as to whether the Board in fact specifically delegated its authority in this area.

In this case, the Board's actions suggest that it had specifically delegated to the superintendent its authority in this area. Superintendent Doe exercised his "usual" discretionary employment authority to hire and fire, by putting Mr. Putnam on administrative leave and by hiring his replacement. In addition, however, Superintendent Doe handled the escalation of the hazing issue, reached out to Drummond Woodsum to conduct an investigation, and received the report summarizing the findings of the hazing investigation. All told, Superintendent Doe's actions may go beyond the usual scope of a superintendent's discretionary authority, and indicate that the Board had delegated broad policymaking authority over RSU 50 procedures to him.

Furthermore, there is evidence that the Board ratified Superintendent Doe's decision when it held a special meeting with the public on the subject of Mr. Putnam's continued employment.[47] This is not a case where the Board refused to review the superintendent's decision or said the superintendent had the sole authority to make such decisions. *See Craig*, 350 F. Supp. 2d at 297 (plaintiff could not maintain a § 1983 claim "based solely upon the school board's refusal to review" the superintendent's decision to terminate his employment). Here, the Board did not merely go along with Superintendent Doe's decision. This is enough to provide the Court with a basis to infer ratification.

---

[47] The Court could find no caselaw from either the Maine Law Court or the First Circuit specifically discussing the requirements to establish ratification for the purpose of generating municipal liability.

Finally, although the evidence in this case does not demonstrate the existence of either a policy or custom under § 1983, it does not demonstrate a lack of those elements. Neither party has presented evidence of the actual RSU 50 policies in place during the time at issue. However, Mr. Putnam has presented some negative evidence in the form of recollections by Board members Hardy, White, and Cullinan. Mr. Hardy stated that Board member Knowles and Superintendent Doe represented that the actions Mr. Doe took were in accordance with RSU 50 policy, but Mr. Hardy was not aware that any such policy was enacted during his time on the Board. Ms. White recalled reading proposed rule changes that would have shifted the responsibility for hiring co-curricular positions from the Board to the superintendent; she told Mr. Knowles and Superintendent Malone that she thought they were acting outside their authority, and neither contradicted her or presented evidence that the policy change had been adopted. Ms. Cullinan's declaration corroborated Ms. White's recollection about the policy proposal. This lack of positive evidence – at least on the 'policy or custom' issue leaves the Court in a quandary, but the presence of other evidence suggesting ratification and/or delegation tips the scales in Mr. Putnam's favor. At the very least, the record shows that trial-worthy issues exist concerning the Board and the superintendents' roles in Mr. Putnam's right to be free from unconstitutional free-speech retaliation, which means the record supports municipal liability on this theory of constitutional injury.

The Court concludes that the record establishes that the Board had final policymaking authority with respect to employment decisions, but also that the

evidence in this case, when viewed in the light most favorable to Mr. Putnam, is sufficient to generate a triable issue as to whether the Board specifically delegated its authority to the superintendent, thus triggering municipal liability under § 1983. The Court denies the Defendants' Motion for Summary Judgment as to Defendant RSU 50 on Count I.

### D.   Count II: Violation of First Amendment Rights Under 42 U.S.C. § 1983

Mr. Putnam's Complaint alleges that the Defendants violated his associational and free speech rights and his right to petition for redress, in violation of the First Amendment and 42 U.S.C. § 1983, when the members of the Board held secret meetings in violation of Board policy and 1 M.R.S. § 403, and when the Board failed to allow for public participation at a public meeting and limited and edited public comments concerning the hazing investigation at that meeting. *Compl.* ¶¶ 47-53.

In their motion, the Defendants argue that § 1983 only provides a remedy for the violation of federally-protected rights and therefore does not entitle Mr. Putnam to relief on Count II, that Mr. Putnam should have brought his claim under Rule 80B of the Maine Rules of Civil Procedure, that Mr. Putnam's claim was untimely under Rule 80B, and that there is no evidence that the Board held any clandestine meetings. *Defs.' Mot.* at 11.  Mr. Putnam maintains that his § 1983 claim is cognizable because 1 M.R.S. § 403 contains no enforcement provision and therefore does not provide him with any redress under state law.  *Pl.'s Opp'n* at 15.  He submits that he has presented evidence that Board members privately discussed matters regarding his employment while those matters were pending before the Board.  *Id.* at 14.  The Defendants

counter that the only discussions in the record were casual encounters and are exceptions to Maine's open meeting requirements, and that Rule 80B provides Mr. Putnam with adequate redress for his claim. *Defs.' Reply* at 3-4.

The issue—as Mr. Putnam has framed it—is whether the Board violated his right to petition and right to freedom of association when it held secret meetings in violation of both Board policy and 1 M.R.S. § 403.

Claims brought pursuant to the § 1983 are valid against officials who, acting under color of state law, violate either the federal Constitution or federal law. *See* 42 U.S.C. § 1983. First, Mr. Putnam must point to a RSU 50 or Board policy, not a violation of a policy, as a source of a constitutional violation in order to attach liability under § 1983.[48] *See Ms. K. v. City of S. Portland*, 407 F. Supp. 2d 290, 296 (D. Me. 2006) ("[U]nder § 1983, a Plaintiff must point to a policy, not a violation of a policy, as the source of the constitutional violation in order to attach liability"). Mr. Putnam has presented no evidence of the Board's policies as the source of the asserted constitutional violation. He has made no substantial argument about how the allegedly secret meetings related to 1 M.R.S. § 403. Second, Mr. Putnam does not cite caselaw, nor could the Court find any, authorizing suits under § 1983 for violations of state law. Even if Mr. Putnam's claim – that the Board held secret meetings in violation of Maine law – violated his First Amendment rights, and might put Count

---

[48]   If the Board had the authority to make the decision but the superintendent actually made it, then the superintendent would have violated either RSU 50 or Board policy. Violations of such policies are not grounds for § 1983 claims, and furthermore, as the Court has already articulated, there is no evidence in the record of any policies allegedly violated.

II within the protection of § 1983, he has not articulated any argument on this point.[49]
Furthermore, Mr. Putnam says that he has no other redress, but provided no binding
caselaw supporting his position.[50]   Finally, even if Mr. Putnam could state a claim
under § 1983 for a violation of section 403, the relevant statute of limitations bars his
claim.[51]   The Court grants summary judgment on Count II as to all Defendants.

### E.   Count III: Due Process Violations

"The Due Process Clause guarantees individuals procedural protections from
state actions that deprive those individuals of their property interests in certain
entitlements and benefits."   *Clukey v. Town of Camden*, 717 F.3d 52, 55 (1st Cir.
2013).   "The threshold issue in a procedural due process action is whether the plaintiff
had a constitutionally protected property interest at stake."   *Id.* (quoting *Mard v.*

---

[49]      Neither party articulated an argument regarding whether the allegedly secret Board meetings violated Mr. Putnam's First Amendment rights.   Mr. Putnam cites only two cases for the broad proposition that the First Amendment provides a right to petition the government for redress, and that right includes access to the courts.   *Pl.'s Opp'n* at 14.   Those are of no assistance in analyzing his claim.

[50]      Mr. Putnam cited only one case in support of his position that "seemed to recognize that Section 1983 claims might be cognizable, if the Plaintiff had no other redress."   *Pl.'s Opp'n* at 15 (citing *Berlickij v. Town of Castleton*, 248 F. Supp. 2d 335 (D. Vt. 2003)).   *Berlickij* does not apply if there is a way to redress Freedom of Access Act (FOAA) violations.   In their motion, Defendants argued that Maine law does provide Mr. Putnam with an avenue to redress municipal violations of 1 M.R.S. § 403 pursuant to Maine Rule of Civil Procedure 80B.   *Defs.' Mot.* at 11.   Mr. Putnam did not respond to this argument. The Defendants appear to be correct.   *See* 1 M.R.S. § 409(2) (providing for an appeal of an improper municipal action under FOAA to Superior Court).   In any event, Mr. Putnam has waived this part of his argument by failing to respond to it.

[51]      Even if § 1983 offered relief for Mr. Putnam, the statute has no internal statute of limitations, and thus § 1983 claims "borrow[ ] the appropriate state law governing limitations unless contrary to federal law."   *Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003).   The applicable statute of limitations for actions pursuant to Maine's Freedom of Access Act is thirty days, and Mr. Putnam filed his complaint well after the expiration of that period.   *See Lewiston Daily Sun v. Sch. Admin. Dist. No. 43*, 1999 ME 143, ¶ 7 n.3, 738 A.2d 1239 ("The first three counts of the complaint were not considered further by the Superior Court, and are not at issue on this appeal, because they were out of time as filed more than 30 days after the events complained of.   M.R. Civ. P. 80(b) requires that such actions "shall be filed within 30 days after notice of any action or refusal to act of which review is sought . . . ").

*Town of Amherst*, 350 F.3d 184, 188 (1st Cir. 2003)).  The Court "determine[s] whether such a property interest exists 'by reference to state law.'" *Acevedo-Feliciano v. Ruiz-Hernandez*, 447 F.3d 115, 121 (1st Cir. 2006) (quoting *Bishop v. Wood*, 426 U.S. 341, 344 (1976)).

The Defendants contend that Mr. Putnam has presented insufficient evidence to support a due process claim, and that he failed to establish a property interest in continued employment, a threshold requirement of a due process action.  First, the Defendants argue the evidence shows Mr. Putnam was afforded numerous opportunities to present his side of the story: he was interviewed as part of the hazing investigation, the Board held a special meeting on the subject of the investigation and Mr. Putnam's employment, and Mr. Putnam met twice with Mr. Malone before Mr. Malone decided to appoint others as baseball coach and athletic director.  *Defs.' Mot.* at 11-12.  Second, they submit, Mr. Putnam does not have a property interest in continued employment at RSU 50, a fundamental requirement of a due process claim.  *Id.* at 12.

Mr. Putnam disregards the Defendants' arguments and instead focuses on his contention that the Board violated its own policies.  He says that the Board had a policy in place that prohibited board members from discussing pending matters outside of public meetings, which created a constitutionally-protected interest the deprivation of which without due process is actionable under § 1983.  *Pl.'s Opp'n* at 15-16.  Mr. Putnam also argues that the Board violated due process when, contrary to Board policies, community members were asked to change their statements when

they came to speak on Mr. Putnam's behalf, when the Board told community members they would have to submit their statements before the meeting and would have to limit their comments to three to five minutes, and when Mr. Malone approved the appointments of John Porter as athletic director and David Day as baseball coach when the Board retained the authority to make those appointments. *Id*. at 16-17.

In reply, the Defendants virtually ignore Mr. Putnam's arguments, repeating their contention that Mr. Putnam lacks a property interest in his employment beyond his one-year contracts, and because he was given sufficient opportunity to respond to the nonrenewal of his contracts. *Defs.' Reply* at 5.

Before turning to the legal analysis of Mr. Putnam's due process claim, the Court notes that Mr. Putnam cited no record evidence to support his argument that the Board violated its own policies. Moreover, the Court could find in the record no evidence of what the Board's policies were at the time Mr. Putnam contends it was violating them. Without evidence of what the Board's policies were, the Court cannot determine whether the Board violated them. Finally, the caselaw Mr. Putnam cites does nothing to support his argument. He cites *Ingraham v. Wright*, 430 U.S. 651 (1977), for the proposition that a school board is not required to have specific policies in place. *Ingraham* certainly does not advance the ball for Mr. Putnam because his argument is premised on the notion that the Board had promulgated policies that it had violated.

Next, he cites *Sandin v. Conner*, 515 U.S. 472 (1995), arguing that once a school board enacts policies, the existence of those policies gives rise to a constitutionally-

protected interest triggering an obligation to follow those policies.  In *Sandin*, a prisoner brought a due process claim against prison officials and the state of Hawaii when an adjustment committee refused to allow the prisoner to present witnesses during a disciplinary hearing and then sentenced the prisoner to segregation for the misconduct.  *Sandin*, 515 U.S. at 475-477.  The Supreme Court held that "neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded [the prisoner] a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff*."[52]  *Id.* at 487.  Mr. Putnam has cited no controlling caselaw that applies *Sandin* in a school board context.  The Court concludes that *Sandin* does not help Mr. Putnam.  Mr. Putnam's arguments in opposition to the Defendants' motion are lacking both evidentiary and legal support.

Although the Court determined that Mr. Putnam has presented no record evidence that the Board had a role in the decision not to renew his contract, the Court will consider whether the Board created a reasonable expectation that Mr. Putnam's employment would continue until retirement.

A property interest can be created when a public employee demonstrates "that he has a reasonable expectation, arising out of a statute, policy, rule, or contract, that he will continue to be employed."[53]  *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 101 (1st Cir. 2002).

---

[52]    *Wolff v. McDonnell*, 418 U.S. 539 (1974).

[53]    Mr. Putnam has not submitted any evidence of his employment contracts.  Even where an employment contract required "cause" for dismissal of a director of special education during the term of her contract, the Maine Supreme Judicial Court concluded that the director had no claim to continued employment because the portion of her contract discussing nonrenewal and nonextension contained no "cause" provision.  *Cook v. Lisbon Sch. Cmte.*, 682 A.2d 672, 676 (Me. 1996).  To determine

Mr. Putnam's Opposition presented no argument on whether state law created a property interest in his continued employment, nor did he cite any supporting caselaw.[54]   Mr. Putnam did allege, however, that the Southern Aroostook school district implicitly agreed by actions, conduct, and verbal representations that he would hold his positions until he chose to retire so long as he did not engage in conduct giving the district just cause to terminate him.   *Compl.* ¶ 56.   Mr. Putnam did not offer any evidence in his Statement of Material Facts or Complaint that would support these alleged representations.   Furthermore, if he is correct that the district was essentially offering him a job until he chose to retire, the one-year term of each of his contracts does not make sense.   Allegations unsupported by any evidence, argument, or caselaw are insufficient to carry Mr. Putnam past the summary judgment phase.

The Court does not address whether Mr. Putnam received procedural due process because he has failed to establish a property interest in his contracts.   *See Coyne v. City of Somerville*, 972 F.2d 440, 443 (1st Cir. 1992).   Because the Court has found no liability on the part of the Board, there can be no municipal liability.   The Court concludes that the Defendants are entitled to summary judgment on Count III.

### F.   Count IV: Age Discrimination in Violation of the Maine Human Rights Act

---

whether Mr. Putnam's contract created a reasonable expectation of continued employment, the Court would have to  examine the contract itself and may not speculate as to what it might have said.

[54]   Nor could the Court find any statute or caselaw that would support the proposition that coaches, athletic directors, or other co-curricular contracted positions have a property interest in continued employment.   In contrast, Maine superintendents, principals, and teachers, for example, enjoy procedural protection.   *See* 20-A M.R.S. §§ 1051-1055, 13201-13202, 13301-13305.

### 1.   The Maine Human Rights Act and *McDonnell Douglas*

Although he did not specify as much in his Complaint, Mr. Putnam appears to have filed his age discrimination claim under the Maine Human Rights Act (MHRA). *See Compl.* ¶¶ 67-68.  Pursuant to the MHRA, it is unlawful "for any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of . . . age . . . ."  5 M.R.S. § 4572(1)(A).  When interpreting MHRA claims of age discrimination, Maine courts commonly refer to parallel federal law.  *See Johnson v. Univ. of Maine Sys.*, Civil No. 05-202-P-S, 2006 WL 2788402, at *20-21 (D. Me. Sept. 25, 2006); *Thorndike v. Kmart Corp.*, 35 F. Supp. 2d 30, 32 (D. Me. 1999).  A plaintiff asserting an age discrimination claim has the burden of establishing "that age was the 'but-for' cause of the employer's adverse action."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).  Additionally, the plaintiff must establish by a preponderance that "age was the 'but-for' cause of the challenged employer decision" with either direct or circumstantial evidence.  *Id.* at 177-78.

Absent direct evidence of discrimination, the Court evaluates age discrimination claims under the familiar burden-shifting standard of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *Cameron v. Idearc Media Corp.*, 685 F.3d 44, 48 (1st Cir. 2012).  A plaintiff must first establish a prima facie case by showing that: (1) the plaintiff was at least forty years old; (2) he met the employer's job performance expectations; (3) the employer took an adverse employment action against him; and (4) the employer subsequently filled the position.[55]  *Id.*  The burden

---

[55]   The parties submit that the fourth element of a prima facie case is that "age was not a neutral factor or [plaintiff] was replaced by a younger employee."  *Defs.' Mot.* at 13; *Pl.'s Opp'n* at 17.  That

then shifts to the employer to produce a "legitimate[,] non-discriminatory reason for termination; and, if this is done, the plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that the defendant's proffered reasons were a pretext for discrimination." *Id.*

## 2.   Direct Evidence of Discrimination[56]

"Although its exact contours remain somewhat murky, the term 'direct evidence' normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and *bear squarely on the contested employment decision.*" *Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir. 2002) (internal quotation marks omitted) (emphasis in original). A lack of temporal proximity between the remarks and the adverse employment action may "undermine[] the reasonableness of any inference that there existed a causal relationship between the remarks and the subsequent decisionmaking by [the employer]." *See id.* at 41-42 (holding remarks made one and a half to two years

---

element, however, does not apply in cases where there was no reduction in force at the place of employment. *See Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 333 (1st Cir. 1997). Furthermore, the case the parties cite, *Gonzalez v. El Dia, Inc.*, 304 F.3d 63 (1st Cir. 2002), does not support their recitation of the elements of a prima facie claim of age discrimination. *See id.* at 68 n.5 (a plaintiff "must adduce evidence that (1) she was at least forty years of age; (2) her job performance met the employer's legitimate expectations; (3) the employer subjected her to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged").

[56]     Although Mr. Putnam never really briefed the issue and instead framed his argument under the *McDonnell Douglas* burden-shifting analysis, he cites portions of the record he says are evidence "that age was indeed a factor in the decision to force [him] from his positions . . . ." *Pl.'s Opp'n* at 18. This suggests to the Court that he believes this is direct evidence of discrimination. However, this argument immediately follows his contention that the hazing report is pretext, which would imply that he offered the evidence to rebut Defendants' legitimate, non-discriminatory reason for not renewing his contract. The Court is concerned by Mr. Putnam's lack of clarity on this issue because of his potential to argue on appeal that whichever course the Court takes was improper. *See, e.g., Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 428-29 (1st Cir. 2000). Therefore, the Court will consider Mr. Putnam's evidence as both direct evidence of age discrimination and evidence of pretext.

between the comments and the adverse employment action lacked temporal proximity).  The comments must "unambiguously display an age-based animus" and cannot be "reasonably susceptible to an entirely benign connotation . . . ."  *Id.* at 42.  Finally, the comments must normally be made by a decisionmaker of record.  *Id.*

Mr. Putnam maintains he presented evidence that supports an inference of discriminatory animus, including: (1) Mr. Malone asked Mr. Putnam in July 2012 how much longer he wanted to work; (2) in 2009, Mr. Porter advised the Board that when Mr. Putnam retired, he could do the work Mr. Putnam was doing as vice principal;[57] and, (3) an anonymous letter received by a Board member in July 2011 said that Mr. Putnam was old and obstinate and that he should retire.  *Pl.'s Opp'n* at 18.  The parties do not dispute that Mr. Malone made the decision to not renew Mr. Putnam's employment contract; thus, Mr. Malone is the decisionmaker of record for the purposes of evaluating discriminatory animus.

First, with respect to Mr. Porter's 2009 comment, the three-year gap between the comment and challenged decision is too large to serve as direct evidence of age-based animus.  Further, the members of the school board to which Mr. Porter directed his comment are likely a different set of people from the members of the RSU 50 board in place when Mr. Malone decided not to renew Mr. Putnam's contract.[58]  Finally, the comment was not made to the decisionmaker of record, Mr. Malone.

---

[57]     Mr. Putnam says that Mr. Porter told the Board that he could do Mr. Putnam's job if he retired.  *Pl.'s Opp'n* at 18.  This is a mischaracterization of the record, and the Court corrected the allegation to accurately reflect the record.
[58]     At least the record does not demonstrate that the school board in 2009 before consolidation was substantially the same as the school board in 2012 after consolidation.

Second, Mr. Putnam conceded that Mr. Malone had not seen the letter before this lawsuit.  Even if the July 2011 anonymous letter biased the RSU 50 Board, Mr. Putnam cites no evidence that the Board either made or influenced the challenged decision; thus, the letter is not probative of Mr. Malone's discriminatory animus.  *See Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990).

Finally, Mr. Malone's question to Mr. Putnam does not unambiguously display an age-based animus.  First, the context of the question is important: Mr. Putnam and Mr. Malone's first meeting was in July 2012, after Mr. Putnam had been placed on administrative leave and his contract had expired.  In that meeting, Mr. Putnam asked to be re-appointed as the varsity baseball coach and athletic director, and Mr. Malone responded by asking "[h]ow much longer do you want to do this?"  Mr. Malone could have been referring to Mr. Putnam's campaign to keep his job, rather than Mr. Putnam's age or retirement plans.  Second, the comment is less suggestive of discriminatory animus than other comments made by employers or decisionmakers that have been found to be "stray" or "isolated" remarks that "demonstrate nothing." *See, e.g., Shorette v. Rite Aid of Maine*, 155 F.3d 8, 13 (1st Cir. 1998) (asking the plaintiff "how old he was and when he planned to retire" was "a textbook example of an isolated remark which demonstrates nothing . . ."); *Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 100 (1st Cir. 2002) ("None of the inquiries . . . about [the employee's] retirement plans had significant probative value; they were brief, stray remarks unrelated to the termination decisional process").  Such "'stray workplace remarks' . . . normally are insufficient, standing alone, to establish pretext or the

requisite discriminatory animus." *Gonzalez*, 304 F.3d at 69 (internal citation omitted). This case is no exception; a stray remark that is not unambiguously suggestive of discriminatory animus does not serve as sufficient direct evidence of discrimination to prove that age was the "but-for" cause of Mr. Putnam's nonrenewal. Thus, the Court proceeds with analyzing Mr. Putnam's claim under the *McDonnell Douglas* burden-shifting framework.

### 3.   The Prima Facie Case

Mr. Putnam is a person over forty years of age, whose employer put him on administrative leave and subsequently did not renew his contracts to serve as baseball coach and athletic director. RSU 50 subsequently filled the positions. The only dispute here is whether Mr. Putnam meets the second prong: that he was qualified for the positions he held.

The Defendants' theory of this case is that Mr. Putnam's nonrenewal was based on his failure to enforce the school's anti-hazing policy, and that he allowed hazing to occur on the spring 2012 baseball trip and previous trips, contrary to the legitimate expectations of his roles as baseball coach and athletic director. *Defs.' Mot.* at 13-14. The Defendants contend that Mr. Putnam knew that the Board and Mr. Doe had concerns about hazing before the 2012 trip, and that the hazing report played a role in the nonrenewal of his employment contracts. *Id*. at 14. This serves as the Defendants' allegedly nondiscriminatory reason for not renewing Mr. Putnam's contracts, which satisfies the second part of the *McDonnell Douglas* burden-shifting

analysis.  Defendants also submit that the "tradition of hazing" means that Mr. Putnam also fails the second prong of the prima facie case.  *Id*. at 13-14.

The First Circuit has made clear that the Court "cannot consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case."  *Melendez v. Autogermana, Inc*., 622 F.3d 46, 51 (1st Cir. 2010) (internal quotation omitted).  The Court considers the evidence Mr. Putnam has presented on whether he was meeting the legitimate job expectations of his roles at the time of nonrenewal, because Mr. Putnam did not submit any argument on this issue.  The record evidence demonstrates that Mr. Putnam had a forty-four-year career in various leadership roles at either Southern Aroostook or RSU 50 and he led the baseball team to five state championships. Mindful that Mr. Putnam's burden at the prima facie stage is not particularly onerous, *see Benoit v. Technical Mfg. Corp*., 331 F.3d 166, 173 (1st Cir. 2003), the Court concludes that this evidence is sufficient to demonstrate there was a triable issue as to Mr. Putnam's ability to meet RSU 50's legitimate expectations.  *See Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 448 (1st Cir. 2009) (legitimate expectations prong met where plaintiff relied on twenty-four years of employment with defendant without being subject to discipline due to his performance).

### 4.   Legitimate and Non-Discriminatory Reason for Nonrenewal

Having concluded that Mr. Putnam successfully established a prima facie case of age discrimination, the Court turns to the second step of the *McDonnell Douglas* burden-shifting analysis: whether the Defendants articulated a legitimate and non-

discriminatory reason for not renewing Mr. Putnam's employment contract. Mr. Putnam has established the "rebuttable presumption that [Defendants] violated the [MHRA]," and the Defendants now have "the burden of production—as distinguished from the burden of proof—. . . to articulate a legitimate, nondiscriminatory basis for [their] adverse employment action." *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 139-140 (1st Cir. 2012) (quoting *González*, 304 F.3d at 68–69).

The Defendants claim they did not renew Mr. Putnam's contract because he allowed hazing to occur on the spring 2012 trip when he was responsible for supervising the students, in violation of the district's anti-hazing policy. *Defs.' Mot.* at 14. The Defendants' stated reason for the nonrenewal of Mr. Putnam's contract was his role in the hazing on the baseball team. *Id.* The Court concludes that this is sufficient to "enable a rational factfinder to conclude that there existed a nondiscriminatory reason" for the nonrenewal of Mr. Putnam's contract. *Ruiz v. Posadas de San Juan Associates*, 124 F.3d 243, 249 (1st Cir. 1997); *see also Garcia v. Bristol–Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008) (employer met its burden of providing a legitimate, non-discriminatory reason by stating that employee was discharged due to her deficient performance).

### 5.    Evidence of Pretext and Discriminatory Animus

At this third and final step, the burden shifts to Mr. Putnam, who, unaided by the presumption that was previously established in the prima facie step, must provide sufficient facts for a reasonable factfinder to conclude that the Defendants' proffered reason for not renewing his contract is pretextual and the true reason for

the nonrenewal was discriminatory animus.  *See Melendez*, 622 F.3d at 52.  Put differently, a plaintiff must offer "some *minimally sufficient* evidence, direct or indirect, both of pretext and of [Defendants'] discriminatory animus." *Acevedo-Parilla*, 696 F.3d at 140 (internal quotation omitted) (emphasis in original).  "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'" *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)). "When assessing a claim of pretext in an employment discrimination case, the court must focus on the motivations and perceptions of the employer's decisionmaker." *Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 126 (1st Cir. 2011).

As an introductory matter, the record supporting Mr. Putnam's pretext argument is exceedingly thin.  The essence of Mr. Putnam's position is that the hazing investigation and the subsequent report were a pretext for RSU 50 to separate him from his roles as baseball coach and athletic director.  He assails the admissibility of the report and the veracity of its contents, but fails to make any argument or cite any caselaw to support a conclusion that the Defendants' articulated reason for not renewing his contract was pretext for age discrimination.

Furthermore, Mr. Putnam has failed to articulate any argument regarding pretext.  He says that "he just needs to make a prima facie case . . . and that he has done." *Pl.'s Opp'n* at 19.  Put simply, Mr. Putnam is wrong.  "The burden of

66

persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  *Gross*, 557 U.S. at 180.

At the same time, the Defendants have offered ample evidence to meet their "limited burden of production," *Vesprini*, 315 F.3d at 43, to demonstrate that the hazing report and associated information before them led them to conclude that Mr. Putnam's actions directly contravened the district's hazing policy, which served as proper grounds for not renewing Mr. Putnam's contract.  The lone comment from Mr. Malone to Mr. Putnam is a "stray remark" that does not carry the day.  Mr. Putnam has failed to meet his burden of establishing that the nondiscriminatory reason relied upon by the Defendants was pretextual and that the challenged employment action was motivated by an age-based animus.

It is true that a reasonable jury could find that the Defendants' reasons for not renewing Mr. Putnam's contract, i.e., the hazing report and allegations of hazing on the baseball team, are not credible.  However, the evidence suggests that the allegations of hazing were pretext for, if anything at all, retaliation against Mr. Putnam for opposing school consolidation, not age discrimination.  The Court concludes that, even viewing the record evidence in the light most favorable to Mr. Putnam, that Mr. Putnam has failed to raise a genuine issue of material fact as to whether the nonrenewal of his employment contract was motivated by age discrimination.

## V.    CONCLUSION

The Court DENIES Defendants' Motion for Summary Judgment on Count I, and GRANTS Defendants' Motion as to Counts II, III, and IV.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of September, 2015